John Louis Evans, III, and Wayne Eugene Ritter were each charged by indictment with the first degree murder of one Edward A. Nassar by shooting him with a pistol while in the commission of a robbery, being a "capital murder" offense within the meaning of Act No. 213, Section 2, Subsection (b), Acts of Alabama 1975, Regular Session.
Experienced counsel was appointed by the trial court to represent each appellant. These attorneys separately moved for a psychiatric examination of each appellant. The trial court granted these motions, and Dr. Claude L. Brown of Mobile filed his report on Appellant Evans April 21, 1977, and on Appellant Ritter April 22, 1977. Each report indicated that the appellant was "competent, rational, and able to stand trial, that he understood thoroughly the nature and results of his actions, had no mental problems, was responsible for his actions, and that each was entirely capable of exercising control and judgment of his conduct." Each report also indicated that each appellant "sincerely seeked the death sentence, preferring this to a long prison sentence." These reports were not submitted to the trial jury.
At arraignment, and against the advice of their respective attorneys, both Evans and Ritter entered guilty pleas. Each further filed a written waiver of any challenge to the composition of the Mobile County Grand Jury after the trial court explained to them in open court that there was a constitutional infirmity in the composition as declared by the United States District Court. Each appellant waived his challenge to this, with the trial court first ascertaining that each was a high school graduate, had been consulted by his attorney concerning his rights to make such challenge, and in writing waived same.
Each appellant also stated in open court that his attorney had explained to him his rights under the Fifth Amendment to the United States Constitution, his right to summon witnesses and cross-examine them, and each further stated in open court that he was aware that one of the punishments which might be imposed was death by electrocution. Each stated that he was aware of his rights to enter not guilty pleas or not *Page 656 
guilty by reason of insanity, and that this had been explained to him by his respective attorney. Each nevertheless at arraignment stated his intention to enter the guilty plea with full knowledge of its consequences.
Each appellant also indicated that his attorney had advised him not to take the stand at trial and not to consult with the press, also not to make public statements.
Each appellant nevertheless consented in writing that the trial be open to television cameras, newspaper photographers, and radio recordings. Each appellant filed a written statement consenting to this.
At arraignment, the trial court advised each appellant that he had a right to a separate trial, but each, separately and in open court, stated that it was his desire to be tried together with the other. This request was granted.
The jury found each appellant guilty as charged in the indictment and fixed punishment at death by electrocution.
Thereafter, the trial court conducted a separate hearing on the aggravating, as well as the mitigating, circumstances presented, then entered judgment with extensive findings that such crime was especially heinous and vicious, and that the judgment of the court having considered both the aggravating and mitigating circumstances shown by the evidence, that the death penalty as fixed by the jury should be and was thereby accepted in each case. The trial court then entered judgment setting sentence at death by electrocution in each case.
This appeal comes to this Court under the "automatic appeal" statute, applicable to judgments wherein the death penalty is pronounced in the trial court.
 I
Michael Wayne Crosby testified that he was employed at Dueitt's Battery and Supply Company in Mobile on January 5, 1977. John Dueitt was also on duty on the afternoon in question when each of them heard a shot next door at the pawn shop wherein Edward A. Nassar was employed. Each of the men stated that he went next door to 3225 Springhill Avenue and saw two white males run out of the store. Crosby made a positive in-court identification of the appellant Evans, and stated that he saw him "putting a gun down the front of his pants" as he ran from the store.
Inside the pawn shop, Crosby and Dueitt found two little girls, ages six and nine, who were the daughters of Nassar, the victim. Crosby stated that Nassar was conscious, that he stated to him that he had been robbed and to call the police. He stated that Dueitt took the two little girls out of the shop, and that he waited there until the police arrived. Crosby stated that he was present when Nassar was placed in an ambulance and taken to the Mobile General Hospital.
Dueitt stated that he had known the deceased, Edward A. Nassar for about six months prior to January 5, 1977. Dueitt indicated that upon hearing the shot, he and Crosby ran next door and saw two white males, who appeared to be in their early twenties, running from the pawn shop. Dueitt made a positive in-court identification of Wayne Eugene Ritter as being one of the two men he saw leaving the pawn shop. He stated that he then took the two little girls next door to his office while Mr. Crosby telephoned the police and an ambulance.
Richard Patterson, age fourteen, stated that shortly after school on the afternoon of January 5, 1977, he was walking with Nena Knipp and Cindy Giardarelli along Springhill Avenue when he saw a light blue Cutlass Supreme automobile, either a 1975 or a 1976 model, circle the block, then park near the railroad tracks. He stated that the automobile twice circled the block before parking. Patterson indicated that two white males in their early twenties got out and walked a short distance. A few minutes later, the two men were running toward the automobile, and that Cindy Giardarelli called out the tag number and he wrote it down on a yellow card which he had in his pocket. Patterson gave the yellow *Page 657 
card with the tag number to Detective Bowman that afternoon. Patterson identified State's Exhibit 9 as the card in question.
Cindy Giardarelli stated that she and Richard Patterson and Nena Knipp were walking near Springhill Avenue after school on the afternoon of January 5, 1977. She saw a 1976 or 1977 light blue Oldsmobile Cutlass Supreme circle the block twice, and on the third time it stopped near the railroad tracks. Two white males got out and walked toward Springhill Avenue, and about fifteen to twenty minutes later, she saw the two men running to the car. The automobile turned around in the driveway, then sped away down the street. As it was turning around, she called out the numbers on the tag, which tag was white in color with blue numbers, and Richard Patterson wrote them on a yellow card. A short time later this information was given to the police.
Mrs. Jimmie Louise Tagert and her husband were stopped on Springhill Avenue in Mobile on January 5, 1977, near the entrance to the pawn shop. Her husband had gone inside and pawned a ring. She saw two men in their early twenties enter the pawn shop, one behind the other, and then she drove away. Mrs. Tagert made a positive in-court identification of Evans and Ritter as being the two men she observed enter the pawn shop immediately after her husband came out.
Mobile Police Officer Wayne Farmer stated that he entered the pawn shop, located at 3225 Springhill Avenue, in response to a call and found Edward A. Nassar lying behind the counter. Farmer stated that Nassar had been shot in the back, and he attempted to straighten out his body in order that he might breathe more easily. He stated that he told Nassar that his two daughters were next door and that they were safe. He stated that he helped Sergeant Bowman place Nassar in an ambulance, which took him to the Mobile General Hospital. Officer Farmer then identified some photographs of the pawn shop area.
Dr. Floyd Thomas Boudreaux testified that he was a pathologist at the Mobile Infirmary and was also Deputy Coroner of Mobile County. He stated that he performed an autopsy on a white male, approximately thirty-two years of age, on January 6, 1977, and that he was assisted by Mr. Kenneth Marx, that Sergeant Moore of the Mobile Police Department was also present. He stated that the victim had a gunshot wound entrance, approximately in the middle of his back, and that the bullet had damaged one of the large veins which leads to the heart, perforated the right upper level of the lung, and came to rest in the large musculature of the interior chest, on the right, from whence it was recovered.
Dr. Boudreaux stated that the cause of death was "exsanguination from the wounds of the vena cava, heart, and right lung." (R. p. 144) He stated this was caused by the bullet wound, and that he recovered a thirty-eight caliber bullet, which was placed in a plastic bag and handed to his assistant, Mr. Kenneth Marx.
Mr. Kenneth Marx identified a plastic bag in which was placed a lead bullet by Dr. Boudreaux while he was assisting him with an autopsy on the body of one Edward A. Nassar. Mr. Marx stated that he sealed the bag and then placed his initials on the tag and handed it to Sergeant Robert Moore.
Sergeant Robert Moore testified he was present with Dr. Boudreaux and Mr. Marx when the autopsy was performed on January 6, 1977. He stated that he received a bullet in a plastic bag, which he, too, placed his initials on, then delivered it to James Small, the State Toxicologist. Sergeant Moore marked the bullet for identification and for delivery to Mr. Small.
Toxicologist James L. Small testified that he received the plastic bag, containing the bullet, from Sergeant Robert Moore on January 6, 1966, that he forwarded it by certified mail to the FBI Laboratory in Washington, D.C., and received a United States Postal receipt from the FBI Laboratory for this.
FBI Agent Bill P. Hardin testified that on March 7, 1977, accompanied by approximately *Page 658 
eight other agents, he went to the Vagabond Motel, just south of Little Rock, Arkansas, about 9:30 p.m. He stated that he had the manager of the motel make a call to Room No. 133 and ask Evans to come to the desk to discuss a telephone bill. He stated that as Evans came outside the motel room, he was arrested. He stated that he then entered the room and found a young white female, named Becky Young. He stated that he then seized a thirty-eight caliber pistol, Serial No. 25402, it being a Dixon Commander, which was lying on the night stand between two beds. He stated that about one hour later, accompanied by several agents, he pulled into the parking lot of a Holiday Inn Motel, and that he had been following a blue 1977 Ford with a North Carolina license into the parking lot.
Becky Young had described Ritter and another female as being the parties who had been driving the car. Agent Hardin stated that at this point Ritter and his companion were arrested. He stated that he removed a thirty-eight caliber Colt Cobra six-shot revolver from underneath the front seat of the car, and that it contained five rounds of ammunition. Agent Hardin stated that he retained possession of the two pistols which he seized on the evening of March 7, 1977, before marking them with identification tags and forwarding them to the FBI ballistics laboratory in Washington. Agent Hardin stated that Evans and Ritter were arrested pursuant to alias warrants for unlawful flight to avoid prosecution.
On March 8, 1977, Agent Hardin, accompanied by FBI Agent Jack E. Juel, interrogated John Louis Evans at the FBI Office, with a stenographer present. After giving Evans a full Miranda
warning, and with no threats, intimidation, coercion, or inducement, the appellant executed a Miranda waiver, dated March 8, 1977. The appellant then gave a statement to Hardin, admitting his involvement in the robbery of the pawn shop in Mobile, and the death of Edward A. Nassar.
Mobile Police Sergeant John W. Phillips, accompanied by Captain Sam McLarty, interrogated Wayne Eugene Ritter on March 11, 1977. The interrogation took place at the Mobile Police Headquarters, second floor, in one of the interrogation rooms. At this time, Ritter, after being fully informed of his constitutional rights, and with no threat, intimidation, coercion, or inducement, executed a waiver of his rights, then gave a statement, admitting his involvement in the robbery of the pawn shop and shooting death of Edward A. Nassar.
FBI Agent Hardin was then recalled to the stand and read the statement taken from Appellant Evans into evidence (R. pp. 182-183):
 "Little Rock, Arkansas. March 8, 1977. I, John Louis Evans, III, furnish the following free and voluntary signed statement to Bill P. Hardin and Jack E. Juel, who have identified themselves to me as Special Agents of the Federal Bureau of Investigation. I understand this statement can be used in court. At Mobile, Alabama, on January 5, 1977, Wayne Eugene Ritter and I entered a pawn shop with the intent to rob that pawn shop of a pistol. When we entered the pawn shop I had a .38 caliber German made revolver hidden in my waistline. Wayne Eugene Ritter asked the store owner to show him a .38 caliber Colt revolver. When the store owner took the revolver from a display shelf and handed it to Wayne Eugene Ritter, I drew my pistol at which time the store owner immediately ducked behind the counter and attempted to reach a gun in a nearby office. I leaned immediately across the counter and fired one shot which I know to have struck the man in the back. Wayne Eugene Ritter and I immediately ran from the store taking with us the .38 caliber Colt revolver. In the store at the time of the shooting were two young girls approximately six and seven years old. When we left the pawn shop we stayed in the Mobile area for approximately two-and-one-half hours. I have read the above statement consisting of this and one other typewritten page. I have initialed each page and any correction. The statement is true to the best of my *Page 659 
knowledge. Signed, John Evans. Witnesses: Jack E. Juel, Special Agent, FBI, Little Rock, 3-8-77; Bill P. Hardin, Special Agent, FBI, Little Rock, 3-8-77."
Jack E. Juel, FBI Agent, who accompanied Bill Hardin in the arrest of Evans and Ritter on March 7, 1977, identified a .38 caliber Dixon Revolver as the one that he and Agent Hardin seized in Room No. 133 at the Vagabond Motel in Little Rock. He stated that he and Hardin forwarded the pistol to the FBI Laboratory on March 10, 1977. This pistol was in the possession of the FBI Laboratory until it was returned to him by the FBI Laboratory Examiner, James Bolenback, the day before the trial.
Mobile Police Sergeant John Phillips was then recalled and identified a waiver of constitutional rights executed by Wayne Eugene Ritter on March 11, 1977, at Police Headquarters in Mobile. Phillips then read the statement given to him by Ritter, after first determining that such was freely and voluntarily given without any threat, intimidation, coercion, or inducement. Ritter's statement is as follows (R. pp. 192-194):
 "My name is Wayne Eugene Ritter, I am 23 years of age, I am currently a prisoner in the Mobile City Jail. I have been advised that I have the right to remain silent and that I have the right to have an attorney present while making a statement. I am waiving both of these rights, and I am making this statement of my own free will. No threats, promises, or offer of reward have been made to me to make this statement. I further understand that this statement can be used against me in a court of law. Sometime during the first week of January, 1977, myself and John Evans were in Biloxi, Mississippi. We left Biloxi about 9:00 A.M. and drove to Mobile, Alabama, and arrived in Mobile about 10:00 A.M. We were driving a 1976 Oldsmobile Cutlass, light blue in color which we had rented from a rental agency in Indianapolis, Indiana. After we arrived in Mobile we drove around town looking at various sporting goods and pawn shops to see which would be the best to hold up. Later in the afternoon after we had looked at about a half a dozen different places we decided on a pawn shop within two or three blocks of Interstate 65. We decided on this place because there was only one man there, and it was a small shop and we didn't figure there would be any trouble. I walked past the store several times wearing a blonde wig to see what was going on at the store. We parked the car on a side street right near some railroad tracks. We left the car and walked around to the pawn shop. We went into the pawn shop and I walked to the back where the guns were in a display case. John was browsing around the store just checking things out. The clerk at the store which was a white male about 30 to 35 years old came from the office area and walked up behind the display case. I asked him to let me see the Colt Cobra Pistol and he handed it to me. When he handed it to me I opened it up and started to put bullets into the cylinder which I had been holding in my hand. While I was doing this, John had drawn his gun, which was an old Dixon .38 caliber. All of a sudden, the clerk broke and ran toward the office area. The next thing I know a shot went off and I turned and took off out the door. I would rather not say who fired the shot. We then ran back to the car and John was driving. We made a U-turn and went back in the other direction and headed to the Interstate. We got on the Interstate and drove to the Highway 90 exit. We drove to a shopping center parking lot near the Interstate and sat there until dark and then drove back to Biloxi, Mississippi. The only other thing I can remember about what happened at the pawn shop was that there were two children inside the store who saw what happened. I cannot recall if anything was said for sure from the time John drew his gun until the shot was fired. I have made this statement to Sergeant John Phillips, Sergeant Marvin Bowman and Captain Samuel McLarty freely and voluntarily and to the best of my belief and knowledge this is a true and accurate statement." *Page 660 
FBI Ballistics Examiner James B. Bolenback testified that his duties involved firearm examinations at the FBI Laboratory in Washington, D.C., that he had been engaged in this work for more than six years. He testified that he had examined the weapons sent to him by Agents Hardin and Juel, also the bullet forwarded to him by Toxicologist Small, and determined that the Dixon revolver, State's Exhibit 12, fired the bullet, State's Exhibit 10, removed from the body of Edward A. Nassar (R. p. 199):
 "A. I determined that the Dixon revolver, State's Exhibit 12, fired the bullet, State's Exhibit 10."
Miss Allilee Pillman testified that she was in charge of the Mobile City Lab, having formerly worked under Dr. Nelson Grubbs in the Toxicologist's Office in Mobile County. Miss Pillman then identified a Colt Cobra box, State's Exhibit 20, Serial No. M71994, which was empty, and which had been delivered to her by Police Officer Myers.
The appellants' attorneys made a motion to exclude the State's evidence on the basis that the State failed to prove a prima facie case as to both Evans and Ritter. Upon consideration of the same, the trial court overruled this motion.
Against the advice of his attorney, and the explanation of the trial court that he did not have to take the stand, Appellant Evans, upon being duly sworn, took the stand and over the objection of his attorney testified as follows (R. p. 211):
 "My name is John Louis Evans, and on January the 5th, I was involved in the crime of Eddie Nassar. I am also the one that did pull the trigger and shoot and kill him during the commission of a felony, a robbery. Our whole trip was based on robbery. Kind of a spree. It was well planned, and I've been in crime a long time. Before you go back in there, the only thing I've got to say to the Jury is that I've been at it a long time, and if you don't come back with a death sentence, which is the only other thing I think you can come out with, I'm going to get out, and I'm going to do it again. There's not any question whatsoever. I have no intention whatsoever of ever reforming in any way, so I think you should do what you have to do, and I would rather die by electrocution than to spend the rest of my life in the penitentiary. So, I'm asking very sincerely that you come back with a positive verdict for the State. That's all I have to say."
On cross-examination, Evans stated that he and Ritter had rented a 1976 light blue Cutlass Supreme automobile in Indianapolis, Indiana, and that this was the vehicle they used in the Nassar robbery and murder. The appellant also admitted participating in some 250 armed robberies, and that both he and Ritter had been on a several state crime spree before being apprehended by the FBI in Little Rock. He also stated that he was taking the stand against the advice of his attorney, and that he had entered his guilty plea voluntarily and signed a waiver voluntarily. He stated that he had been advised by his attorney twenty to thirty times not to pursue the course he pursued at trial.
Evans also stated that he had no remorse over having shot the deceased, Mr. Nassar.
Wayne Eugene Ritter, also over the objection and against the advice of his attorney, having first been duly sworn, testified that he met Evans while each was serving time for armed robbery in prison in Indiana, that they began planning, upon their releases, to get together. He asked if he could make a spontaneous statement to the court. Ritter's statement is as follows (R. pp. 218-220, Volume II):
 "A. With some of the testimony by Mr. Graddick's witnesses, but I think I can clear that up. We were in Biloxi, and we had run low on money, so we came over here with the intention of robbing. On the way, we decided while we were here pulling a robbery, we might as well go ahead and get some guns. We got in town, it was approximately ten or eleven o'clock in the morning, and we looked in the phone book, got names and addresses of various sporting goods stores and pawn shops, and started riding around *Page 661 
and looking to see which one would be the easiest. Later that afternoon we finally got to Mr. Nassar's place, The Pawn Shop, and we drove by it a few times, and it was a nice, small place. Looked very easy. So we decided that would be the place. And, we found a place to park, which was over by the railroad tracks, which they've already stated, and we went in. The plan was that I was to ask to see a pistol. I had some .38 caliber ammunition in my left hand and we went in, I asked Mr. Nassar to see the gun, he handed it to me, I opened it up, looked at it, John started to draw his gun, and I started loading the pistol he showed me. Immediately, Nassar dropped down and started going around the corner, which was an "L" shape, the counter, then towards the office. He got to the office, reached up with, I believe, his left hand, to a counter or something, and that's when he was shot. We knew he was going for a gun. He wouldn't have hesitated to kill us, so he had to be killed. There was no other way. And then we left, and I was first out the door, and we ran around the corner, back down to the car, and we ended up putting the guns away, etc. We didnt — . We both had the guns in our hands all the way down the street. When we got in the car, we got back on 65, and went to the Highway 90 exit, where we stopped at a shopping center right there, intersection of 65 and Highway 90, sat there until it got dark, because we knew the car had been spotted, there were just too many people around. I wasn't quite sure who spotted it, but we knew it had been spotted. Waited until dark, and then decided to leave town by way of Highway 90. On the way out of town, we still hadn't gotten any money, which was our main objective when we came over here, so we stopped, and I robbed a Radio Shack on Highway 90, and then we went on into Biloxi. John's pretty well covered the rest of the story. We pulled approximately thirty armed robberies, nine kidnappings, two extortions, a couple of stolen cars, various other small charges.
 "Q. Mr. Ritter, do you want to say anything to these people sitting in the Jury Box as to what you want them to do when they go back there?
 "A. Well, I think there are two considerations. First, we did kill Mr. Nassar. We knew we might have to kill somebody during any robbery. We had discussed it before. If anybody went for a gun, that's what was going to happen. We did kill him, so, really, the only thing you can come back with is the death penalty. And the other consideration is, if you give me life, or if I got life imprisonment, I could get out in ten or fifteen years, and when I got out, I know where everybody on the Jury lives, and I wouldn't appreciate being in prison for ten or fifteen years, so I think I would have to come after you. That's about it."
On cross-examination Ritter stated that he was entirely satisfied with his representation of his attorney, that he had taken the stand against his advice, and that no one had offered him any hope of leniency, or hope of reward, and that he wished to die by electrocution. Ritter admitted that the pistol seized from him at the time of his arrest by Agents Hardin and Juel in Little Rock was the pistol which he had stolen from the pawn shop in Mobile. Ritter further stated that he would have fired the pistol at Nassar on the date in question, but that Evans was in his line of fire.
An extensive oral charge was given to the jury to which no exception was taken.
 I
The able attorneys appointed to represent the appellants have been given a most perplexing responsibility. Here again, over their specific advice, and over their objections, each appellant went before the Mobile County Grand Jury and openly testified as to his involvement in the robbery and murder of Edward A. Nassar.
When each appellant appeared at arraignment, against the advice of his attorney and over the advice of the trial court, he entered a guilty plea. At trial, each *Page 662 
appellant, again against the advice of his attorney, and over his attorney's objection, took the stand and openly admitted his participation in the robbery and murder of Edward A. Nassar.
These attorneys have performed a great public service at considerable sacrifice to themselves. Each appellant admitted that he had no complaint with the caliber of representation, and that his attorney had fully advised him at each step of the proceeding of his constitutional rights.
Beyond question, there can be no fault, or suggestion of fault, attributed to the caliber of representation of each appellant by his respective attorney.
This Court specifically finds that both Evans and Ritter were fully, fairly, and thoroughly represented by these attorneys.
 II
Attorneys for the appellants assert that they did not waive the issue of the constitutionality of the statute under which each appellant was prosecuted.
We commend them for their assertion, however, this Court in an opinion known as Jacobs v. State, 361 So.2d 607 (1977), unanimously upheld the constitutionality of the Act here challenged. This Court, through Harris, J., speaking for a unanimous Court, stated:
 "We hold the New Death Statute of this State is constitutional under both the Eighth and Fourteenth Amendments to the Constitution of the United States, and the judgment of conviction is, in all things, affirmed."
 III
Appellants' attorneys also assert that the post jury sentencing process violates due process by, in effect, requiring the appellants to prove to the trial court why they should not die since at this juncture the appellant is under a sentence of death.
As in Jacobs, supra, Judge Hocklander, the trial judge, conducted an extensive hearing, as required by Title 15, Section 342, Subsections (8) and (9), Code of Alabama 1940, as amended 1975, as to the aggravating and mitigating circumstances in this cause. Extensive findings were made by the trial judge, which are here made an appendix to this opinion.
This Court determined in Jacobs, supra, that this procedure was very similar to the procedure approved by the Supreme Court of the United States in Proffitt v. Florida, 428 U.S. 242,96 S.Ct. 2960, 49 L.Ed.2d 913, inasmuch as the jury's verdict is not binding upon the trial judge. Title 15, Section 342 (6), Code of Alabama 1940, as amended 1975.
The aggravating circumstances were here averred and proved at trial, and also determined by the trial judge in a public hearing, as required by law.
In addition, this Court has weighed the aggravating and mitigating circumstances independently.
As stated by Harris, J., in Jacobs, supra:
 "The aggravating circumstances found by the trial court are amply supported by the evidence in this case. The verdict of the jury is overwhelmingly sustained by a preponderance of the evidence."
Additionally, this Court has weighed the various factors presented by this record, and is of the opinion that the punishment here imposed fits the crime for which each appellant has been found guilty thereof.
A careful reading of this record convinces this Court that each appellant has here followed the course of action pursued at trial with full knowledge of its consequences. Further writing on this point would serve no worthwhile purpose. This Court is convinced that each appellant is sincere in seeking the death sentence, preferring this course to a long prison sentence.
After careful examination of this record, as required by law, most specifically where the death penalty is involved, we find that the procedures here mandated by the Alabama statutes fully comport with *Page 663 
constitutional demands of the Eighth and Fourteenth Amendments to the United States Constitution.
The judgment of conviction and sentence of death as to each appellant is in all respects affirmed.
We will not set the date of execution of these sentences until this case runs its course through the courts.
AFFIRMED.
All the Judges concur.
 APPENDIX
THE COURT Will you please rise? The Court, having conducted a Hearing pursuant to Section 3 of Act No. 213 of the Legislature of Alabama, Regular Session 1975, to determine whether or not the Court will sentence Mr. John Louis Evans, III to death or to life imprisonment without parole; and the Court having considered the evidence presented at the trial and at said sentence hearing; the Court makes the following findings of fact:
 The Court first considers the aggravating circumstances as described in Section 6 of said Act 213:
 (a) The Court finds that the Capital Felony was committed by Mr. Evans while he was under sentence of imprisonment, although he was serving the latter part of his sentence on parole at the time.
 (b) The Court finds no convincing evidence that Mr. Evans was previously convicted of another Capital Felony or a felony involving the use or threat of violence to the person.
 (c) The Court finds that on numerous prior occasions Mr. Evans knowingly created a great risk of death to many persons. By Mr. Evans' testimony, he was involved in thirty armed robberies and nine kidnappings with Mr. Ritter, and further claims to have been involved in approximately 250 armed robberies prior to associating with Mr. Ritter.
 (d) The Court finds that the Capital Felony was committed while Mr. Evans was engaged in the commission or attempt to commit a robbery.
 (e) The Court finds that the Capital Felony was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
 (f) The Court finds that the Capital Felony was not committed for pecuniary gain, within the meaning of Section 6 (f) of said Act 213.
 (g) The Court finds the Capital Felony was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
 (h) The Court finds that the Capital Felony was committed in the immediate presence of the two young daughters of Edward A. Nassar, deceased, aged approximately 9 years and 7 years, respectively. The Court finds that Edward A. Nassar, deceased, was shot through the back while he was unarmed and crawling along the aisle behind the counter. The Court finds no evidence that he was ordered to halt or given any warning before being shot. While in the personal opinion of the Court, the Capital Felony was especially heinous or attrocious the Court has no precedent or authority which would allow it to hold as a matter of law that this Capital Felony meets the test of being especially heinous or attrocious or cruel, as set out in Section (h) of Section 6 of Act 213, and so the Court makes no finding on this point.
 The Court now considers mitigating circumstances as described in Section 7 of said Act 213:
 (a) The Court finds that Mr. Evans has a significant, extensive history of prior criminal activity.
 (b) The Court finds that the Capital Felony was not committed while Mr. Evans was under the influence of extreme mental or emotional disturbance.
 (c) The Court finds that the victim was not a participant in Mr. Evans' conduct, and did not consent to the act.
 (d) The Court finds that Mr. Evans was not an accomplice in the Capital Felony committed, but was, in fact, the principal who fired the shot causing the death of Edward A. Nassar, deceased. *Page 664 
 (e) The Court finds that Mr. Evans did not act under extreme duress or under the substantial domination of another person.
 (f) The Court finds that the capacity of Mr. Evans to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired, and was not, in fact, impaired in any degree.
 (g) The Court finds that Mr. Evans' age at the time of the crime is not a mitigating circumstance.
 (h) The Court finds further another mitigating circumstance, although not set out as such in Section 7 of said Act 213, to be the fact that Mr. Evans made no effort or attempt to harm the two young daughters of Edward A. Nassar, deceased, who were in his immediate presence at the time of the commission of the Capital Felony or any of the other witnesses in the vicinity.
The Court having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances; it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty as fixed by the Jury should be and is hereby accepted.
It is therefore considered and adjudged by the Court that John Louis Evans, III is guilty of the Capital Felony charged in the indictment, and specifically of intentionally killing Edward A. Nassar during the robbery or attempt thereof of the said Edward A. Nassar, deceased. It is therefore ordered and adjudged that you, John Louis Evans, III suffer death by electrocution at any time before the hour of sunrise on the 25th day of July, 1977, inside the walls of the William C. Holman Unit of the Prison System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ordered and adjudged by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability, or absence, his Deputy, or in the event of the death, disability, or absence of both the Warden and his Deputy, the person appointed by the Commissioner of Corrections, at any time before the hour of sunrise, shall on the 25th day of July, 1977, inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said John Louis Evans, III, a current of electricity of sufficient intensity to cause his death, and the continuance and application of such current through the body of the said John Louis Evans, III, until the said John Louis Evans, III, be dead, May God Have Mercy on Your Soul. You may be seated.
THE COURT Mr. Wayne Eugene Ritter, do you have anything to say why the sentence of law should not be passed against you?
MR. RITTER No, I don't.
THE COURT Will you please rise? The Court having conducted a Hearing pursuant to Section 3 of Act No. 213 of the Legislature of Alabama, Regular Session 1975 to determine whether or not the Court will sentence Mr. Wayne Eugene Ritter to death or to life imprisonment without parole; and the Court having considered the evidence presented at the trial and at said sentence hearing, the Court makes the following findings of fact:
 The Court first considers the aggravating circumstances as described in Section 6 of said Act 213:
 (a) The Court finds that the Capital Felony was committed by Mr. Ritter while he was under sentence of imprisonment although he was serving the remainder of his sentence on parole at the time;
 (b) The Court finds that Mr. Ritter has been previously convicted of another felony involving the use or threat of violence to the person; to wit: the offense of robbery;
 (c) The Court finds that Mr. Ritter has knowingly on approximately thirty-nine previous occasions created a great risk of death to many persons; *Page 665 
 (d) The Court finds that the Capital Felony was committed while Mr. Ritter was an accomplice in the commission of a robbery;
 (e) The Court finds that the Capital Felony was not committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
 (f) The Court finds the Capital Felony was not committed for pecuniary gain, within the meaning of Section 6 (f) of said Act 213;
 (g) The Court finds the Capital Felony was not committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
 (h) The Court finds that the Capital Felony was committed in the immediate presence of the two young daughters of Edward A. Nassar, deceased, aged approximately nine years and seven years respectively. The Court finds that Edward A. Nassar, deceased, was shot through the back while he was unarmed and crawling along the aisle behind the counter. The Court finds no evidence that he was ordered to halt or given any warning before being shot. While in the personal opinion of the Court the Capital Felony was especially heinous or attrocious, the Court has no precedent or authority which would allow it to hold as a matter of law that this Capital Felony meets the test of being especially heinous or attrocious or cruel, as set out in Section (h) of Section 6 of Act 213, and so the Court makes no finding on this point.
 The Court now considers mitigating circumstances as described in Section 7 of said Act 213:
 (a) The Court finds that Mr. Wayne Eugene Ritter has a significant history of prior criminal activity;
 (b) The Court finds that the Capital Felony was not committed while Mr. Wayne Eugene Ritter was under the influence of extreme mental or emotional disturbance;
 (c) The Court finds that the victim was not a participant in Mr. Wayne Eugene Ritter's conduct and did not consent to the act;
 (d) The Court finds that while Mr. Wayne Eugene Ritter was an accomplice in the Capital Felony committed by another person, his participation was not relatively minor, and by Mr. Ritter's own statement, he was prepared to shoot Edward A. Nassar, deceased, but could not fire because his accomplice, John L. Evans, III was in his line of fire;
 (e) The Court finds that Mr. Wayne Eugene Ritter did not act under extreme duress or under the substantial domination of another person;
 (f) The Court finds that the capacity of Mr. Ritter to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired or impaired in any degree;
 (g) The Court finds that Mr. Wayne Eugene Ritter's age at the time of the crime to be a mitigating circumstance;
 (h) The Court finds further another mitigating circumstance, although not set out as such in Section 7 of said Act 213, to be the fact that Mr. Ritter made no effort or attempt to harm the two young daughters of Edward A. Nassar, deceased, who were in his immediate presence at the time of the commission of the Capital Felony or any of the other witnesses in the vicinity.
The Court, having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances; it is the judgment of the Court that the aggravating circumstances far outweigh the mitigating circumstances and that the death penalty as fixed by the Jury should be and is hereby accepted.
It is therefore considered and adjudged by the Court that Wayne Eugene Ritter is guilty of the Capital Felony charged in the indictment, and specifically of intentionally killing Edward A. Nassar during the robbery or attempt thereof of the said Edward A. Nassar, deceased. It is therefore ordered and adjudged that you, Wayne Eugene Ritter, suffer death by electrocution at any time before the hour of sunrise on the 25th day of July, 1977 inside the walls of the William C. Holman Unit of the Prison *Page 666 
System at Atmore, Alabama, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution.
It is therefore further ordered and adjudged by the Court that the Warden of William C. Holman Unit of the Prison System at Atmore, or in the case of his death, disability or absence, his Deputy, or in the event of the death, disability or absence of both the Warden and his Deputy, the person appointed by the Commissioner of Corrections, at any time before the hour of sunrise, shall on the 25th day of July, 1977 inside the walls of the William C. Holman Unit of the Prison System at Atmore, in a room arranged for the purpose of electrocuting convicts sentenced to death by electrocution, cause to pass through the body of the said Wayne Eugene Ritter a current of electricity of sufficient intensity to cause his death, and the continuance and application of such current through the body of the said Wayne Eugene Ritter until the said Wayne Eugene Ritter be dead, May God Have Mercy On Your Soul.
MR. RITTER Thank you, your Honor.
THE COURT Take charge of the prisoners. (Whereupon, the Court was adjourned at 12:20 P.M.)