**Wayne E. RITTER, Petitioner,**

v.

**Fred SMITH, Commissioner, Alabama Department of Corrections, and J.D. White, Warden, Holman Unit, Respondents.**

**Civ. A. No. 83–0457–H.**

United States District Court, S.D. Alabama, S.D.

Aug. 11, 1983.

---

See also, 429 So.2d 928.

**1502**

John L. Carroll, Ira A. Burnim, Montgomery, Ala., for petitioner.

Ed Carnes, Asst. Atty. Gen., State of Ala., Montgomery, Ala., for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

### I. INTRODUCTION

This cause came before the Court pursuant to Wayne Eugene Ritter's petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. Petitioner was tried and convicted of capital murder and sentenced to death in 1977 in an Alabama state court.

Petitioner and John Lewis Evans committed an armed robbery of a pawn shop in Mobile, Alabama on January 5, 1977. During the course of the robbery, the pawn shop proprietor, Mr. Edward Nassar, was shot in the back by Evans and died. Petitioner and Evans were indicted under Alabama's capital murder statute. Each expressed a desire to plead guilty and forego a jury trial but that procedure was not permissible under the death penalty statute then in force. *See Prothro v. State,* 370 So.2d 740 (Ala.Cr.App.1979). Petitioner and Evans gave inculpatory statements to the Grand Jury and each testified at trial admitting the necessary elements of the capital murder indictment and demanded the death penalty. The jury returned a verdict of guilty and, pursuant to the dictates of the death penalty statute, included in its verdict a sentence of death. Following the verdict, additional evidence was presented to the trial judge regarding the aggravating and mitigating factors set out in *Code of Alabama,* 1975, Section 13–11–6 and 7, following which the trial judge sentenced petitioner and Evans to death. The conviction and death sentence were subject to automatic review under *Code of Alabama,* 1975, Section 13–11–5, and petitioner's case was in the Alabama appellate courts or before the Supreme Court of the United States for six years. *Certiorari* was granted by the United States Supreme Court on three occasions, but each resulted in a remand rather than any decision on the merits.

This petition involves the first presentation of petitioner's claims to the Federal Courts under 28 U.S.C. § 2254. The petition was filed on May 5, 1983 alleging ten separate claims for habeas corpus relief. At that time petitioner was scheduled to be executed on May 13, 1983. Following an initial hearing on the petition, the Court determined it had jurisdiction[1] and that at least one of the ten alleged constitutional deprivations alleged in Mr. Ritter's petition raised substantial federal questions, and accordingly issued an order staying execution. The second evidentiary hearing was conducted on June 1 and 2, 1983, following discovery. The parties have filed briefs and proposed findings of fact and conclusions of law.

As noted above the petition advances ten separately identified claims. By order dated May 11, 1983, this Court directed petitioner to amend his petition and to present in this action any additional claims which he believed provided a basis for relief from his conviction or sentence. No amendment was filed. The Court therefore considers the ten grounds advanced in petitioner's original petition as the only basis upon which habeas corpus relief is available to the petitioner, and that any additional grounds have been waived. Habeas Rule 9(b). The Court will address each of these ten claims in this opinion.

---

1. For a procedural history of this case see *Ritter v. State,* 429 So.2d 928, 929–932 (Ala.1983).

For the reasons discussed more fully in the body of this decision, the Court concludes that there is no basis for the claimed relief and the petition will be dismissed with prejudice. The Court will also order that the stay entered May 6, 1983 be dissolved.

## II. FINDINGS OF FACT

Based upon all of the records, files, exhibits, and testimony herein, this Court finds the following facts:

### A. Electrocution as Cruel and Unusual Punishment

1. At the two day habeas hearing the Court took testimony on essentially three of the ten issues. The first dealt with whether capital punishment as practiced by the State of Alabama violated the Eighth Amendment's Cruel and Unusual Punishment Clause. That claim was dismissed pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for reasons stated on the record. The second and third issues related to the Alabama "preclusion clause". (See discussion *infra*). In particular testimony was taken on: 1) whether the "preclusion clause" was a factor in the petitioner's adoption of a trial strategy to intentionally seek the death penalty; and 2) whether despite petitioner's trial strategy he was entitled to a jury instruction on the lesser included offense of felony murder.

### B. Preclusion Clause—Trial Strategy

2. Petitioner was tried and convicted under the 1975 Alabama capital punishment law which defined some fourteen crimes for which the death penalty might be imposed and which also provided that an indictment and trial for one of those fourteen offenses "shall not include any lesser offenses . . . ." *Code of Alabama*, 1975, Section 13–11–3. The clause was later found to be unconstitutional in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). That decision was later modified in *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) which provides that the entitlement of the lesser included offense instruction is warranted only in those cases in which the evidence reasonably could support a verdict on the lesser included offense.

3. Petitioner claims that the "preclusion clause" has prejudiced him in two ways. First, he claims that his trial and pretrial tactics of confessing to the crime, cooperating with the prosecution, and attempting to coerce the jury into a guilty verdict were all motivated in part by his knowledge of the preclusion clause. Second, petitioner contends that without regard to the impact of the preclusion clause on petitioner's trial tactics, he was entitled under *Beck, supra,* and other applicable state and federal law to a charge on the lesser included non-capital felony murder offense.

4. At the habeas hearing on June 2, 1983, petitioner testified that he and his co-defendant, John Lewis Evans, entered a pawn shop in Mobile, Alabama on January 5, 1977, for the purpose of robbing the proprietor and obtaining a different handgun for the petitioner. During the course of the robbery, the proprietor, Mr. Edward Nassar, was shot and fatally wounded by Evans. This was one of a series of crimes committed by Evans and the petitioner between December 25, 1976 and March 7, 1977. In all, the pair committed some three dozen violent crimes during this crime spree including armed robbery, kidnapping, extortion and murder.

5. Petitioner testified at his trial that during the two-and-a-half month long multi-state crime spree, petitioner knew that sooner or later law enforcement officers would catch up with him and Evans. (Exhibit 1, 343) In his own words, "we didn't intend to be taken alive when it did happen . . . mainly because we didn't want to spend all that time in prison." *Id.* Accordingly, petitioner and his co-defendant Evans entered into a pact in which they agreed to shoot it out with law enforcement officers and be killed rather than be captured alive. (Exhibit 1, 330–331, 343–344) On cross-examination at the habeas hearing, petitioner admitted that his above-described testimony in his state court trial was true.

6. On March 7, 1977, petitioner and Evans were captured separately in Little

Rock, Arkansas by FBI agents. (Testimony of Agents Bill Hardin and Jack Juel at the evidentiary hearing; Exhibit 1, 344).

7. The only reason petitioner was captured alive was the circumstances under which the FBI agents surprised and captured him. (Exhibit 1, 344) Upon being captured, petitioner expressed disappointment that he had been captured alive, and, indeed, made a statement to one of the FBI agents which was to the effect of: Why hadn't they shot him, because it would have saved everyone a lot of trouble. (Testimony at the evidentiary hearing)

8. On March 8, 1977, in Little Rock, Arkansas, after being repeatedly advised of his *Miranda* rights and freely waiving them, petitioner freely and voluntarily confessed to FBI agents his guilt for the many violent felonies he and Evans had committed in the above-described crime spree. (Exhibit 1, 293–312; testimony of agents Hardin and Juel at the evidentiary hearing).

9. On March 8, 1977, in Little Rock, Arkansas, petitioner stated to FBI agents who were interviewing him that he preferred execution to spending the rest of his life in prison, and he indicated at that time that he intended to seek execution when he returned to Alabama. Agent Hardin testified that Mr. Ritter told him that he (Ritter) had led a good life and had done more in a short period of time than most people do in their entire lives. Agent Hardin also stated that he personally had at that time no knowledge of the preclusion clause. Agent Juel testified that both Ritter and Evans indicated a preference for death over life imprisonment. Agent Juel further testified that this statement had not been included in their reports because the arrestees' philosophy was not relevant to a report on crimes committed. Nevertheless, he was certain they made the "death preference" statement because he had never heard such

a statement in his then previous thirteen years of service. (Testimony of Agents Hardin and Juel at the evidentiary hearing). The Court finds that at the time petitioner made those statements and expressed that intent, he had no knowledge of the procedural aspects of Alabama's capital punishment statute, the preclusion clause, or the sentence alternatives available under the statute. (Testimony of Agents Hardin and Juel at the evidentiary hearing; testimony of Ritter at the evidentiary hearing).[2]

10. Sometime after March 8, 1977, and on or before March 11, 1977, petitioner waived extradition and was flown from Little Rock, Arkansas to Mobile, Alabama. (Testimony of Captain Sam McLarity at the evidentiary hearing.) After being advised of his *Miranda* rights and freely and voluntarily waiving them, petitioner made several oral statements to the Mobile police officers who accompanied him on the flight back to Alabama. (Testimony of Captain McLarity at the evidentiary hearing). On that flight John Evans in the presence of petitioner asked Captain McLarity if Alabama had a death penalty statute. Captain McLarity responded in the affirmative. Both Evans and petitioner then stated that they intended to plead guilty and seek the death penalty. Indeed, petitioner stated that he hoped he could be executed within sixty days. There was no talk of the preclusion clause during that discussion. Like Agent Juel, Captain McLarity stated, the death preference statement was so unique that he could not forget it; he had never heard anything like it before. (Testimony of Officer McLarity at the evidentiary hearing.) The Court finds that at the time petitioner made those statements and expressed that intent, he had no knowledge of the procedural aspects of Alabama's capital punishment statute, the preclusion clause, or the sentence alternatives available under

---

**2.** Petitioner testified at the evidentiary hearing that he was not certain as to when he first found out about the preclusion clause, but that he probably *did not hear of it* until after arriving in Alabama. Petitioner's trial lawyer does not remember discussing the preclusion clause with petitioner. (Testimony of Attorney Stephens at hearing.) It appears as though petitioner may have learned about the preclusion clause and other aspects of Alabama capital punishment law from the Mobile District Attorney. (Exhibit 1, 331). That would have been after he waived extradition, and after he made his statements to the FBI and the Mobile Police Department indicating his decision to seek the death penalty.

the statute. (Testimony of Officer McLarity and Ritter at the evidentiary hearing).[3]

11. Continuously, from the first day he arrived back in Alabama, which was on or before March 11, 1977, throughout his entire trial and sentencing proceedings, petitioner intentionally and stubbornly pursued a course of actively assisting the prosecution in proving beyond a reasonable doubt that he was guilty of the capital offense and that he deserved the death penalty. He did so as early as in his formal interview with Mobile police officers (Exhibit 1, 288–292); at the Grand Jury, before whom he insisted on appearing (Exhibit 1, 24, 338–347); at arraignment where he entered an oral guilty plea (Exhibit 1, 27, 59–60); and at trial when he entered a written guilty plea and took the stand to testify against himself. (Exhibit 1, 207–10, 216–221, 252, 283). When the jury verdict convicting him of the capital offense and fixing his punishment at death was read, petitioner turned, smiled, and gave a "thumbs up" gesture of approval. (Exhibit 2, television tape of testimony).

12. Petitioner's course of actively admitting his guilt of the capital offense and seeking the death penalty continued at least up through the Alabama Supreme Court's first decision in the case, which was entered on May 19, 1978. *Evans and Ritter v. State,* 361 So.2d 666, 667 (Ala.1978) ("[N]either petitioner has expressed dissatisfaction with his conviction nor his death sentence. . . .")

13. The course of conduct described in the preceding paragraphs was freely, knowingly and voluntarily undertaken by petitioner against the repeated and emphatic advice of his able and experienced attorney. (Exhibit 1, 22–23, 24, 48–54, 57–59, 217–220, 284, 318–320; testimony of attorney Reggie Stephens and of petitioner at the evidentiary hearing.) As the Alabama Court of Criminal Appeals found regarding both petitioner and his co-defendant Evans:

> The able attorneys appointed to represent the appellants have been given a most perplexing responsibility. Here again, over their specific advice, and over their objections, each appellant went before the Mobile County Grand Jury and openly testified as to his involvement in the robbery and murder of Edward A. Nassar.

> When each appellant appeared at arraignment, against the advice of his attorney and over the advice of the trial court, he entered a guilty plea. At trial, each appellant, again against the advice of his attorney's objection, took the stand and openly admitted his participation in the robbery and murder of Edward A. Nassar.

> These attorneys have performed a great public service at considerable sacrifice to themselves. Each appellant admitted that he had no complaint with the caliber of representation, and that his attorney had fully advised him at each step of the proceedings of his constitutional rights.

> Beyond question, there can be no fault, or suggestion of fault, attributed to the caliber of representation of each appellant by his respective attorney.

> This court specifically finds that both Evans and Ritter were fully, fairly, and thoroughly represented by these attorneys.

*Evans v. State,* 361 So.2d 654, 661–662 (Ala. Cr.App.1977).

14. As a result of confessions that he freely and voluntarily gave after being advised of and waiving his *Miranda* rights, including confessions he gave to the FBI agents before he knew anything about Alabama's capital punishment statute, petitioner had detainers from at least five different states lodged against him. Those detainers involved multiple charges of armed robbery, kidnapping, aggravated kidnapping, aggravated burglary, and aggravated robbery. (Exhibit 1, 233, 349–354, 365, 358, 365–367; Exhibit 3.) In addition, those states and other states would have brought additional charges and lodged additional detainers against the petitioner if he had not been sentenced to death in Alabama. (Exhibit 1, 233.)

**3.** See footnote 2, *supra.*

15. At the time petitioner undertook the self-destructive strategy that he pursued in the Alabama court system, the petitioner knew that even if he somehow could have escaped the death penalty and obtained parole in Alabama, he would never have finished serving the prison sentences he would have received for all of the violent felonies he had confessed to committing in other states. (Exhibit 1, 346; testimony of petitioner at the evidentiary hearing.) In addition, petitioner had violated parole from a previous robbery sentence to begin this multi-state crime spree (Exhibit 1, 230, 243, 338), and he believed that he would never be paroled again no matter what happened in Alabama. Petitioner also admitted at the hearing, even if he had somehow been eligible for and had received a parole from his Alabama crimes, other states were waiting with enough charges to give him more sentences than he could serve in five lifetimes. (Testimony of petitioner at evidentiary hearing.)

16. It is apparent to the Court, based upon the above-described findings of fact, that the reason petitioner pursued the self-destructive course of action that he did through the Alabama court system was his preference for death over a long prison sentence or series of long prison sentences. *Evans v. State,* 361 So.2d 654, 662 (Ala.Cr. App.1977) ("This court is convinced that each appellant is sincere in seeking the death sentence, preferring this course to a long prison sentence.") (Exhibit 1, 259, 346; testimony of Dr. Brown,[4] Agent Hardin, Agent Juel, and Captain McLarity.) Because of the circumstances specified in the preceding paragraph, petitioner made no distinction between a life sentence and a life without parole sentence. (Testimony of Attorney Reggie Stephens at the evidentiary hearing.)

17. The only other factor that possibly contributed to petitioner's course of conduct was his appetite for publicity and notoriety and his desire for news media attention, which petitioner referred to as having the effect of a drug. (Testimony of petitioner at the evidentiary hearing.) However, even if there had been no news media coverage and publicity, petitioner would still have pursued the same course of action he did. This is apparent because his intention to pursue that course of action was formulated and first announced before petitioner returned to Mobile, Alabama and before meeting with the press. (Testimony of Agents Hardin and Juel, and Captain McLarity.)

18. Petitioner's claim, that he would have undertaken a different course of conduct in the Alabama court system had it not been for various provisions of the Alabama capital punishment statute, lacks credibility and other than petitioner's self-serving statements at the evidentiary hearing, has no basis in the evidence whatsoever. The testimony of all of the witnesses at the hearing, including the testimony of his former attorney, supports the finding of fact that petitioner's determination to seek the death penalty and adopt a concomitant trial strategy was made before he returned to Mobile for trial and without any knowledge whatsoever of Alabama criminal procedure. Petitioner's claim that he would have undertaken a different course of conduct in the Alabama court system had it not been for various provisions of the Alabama capital punishment statute is also contradicted by his own testimony at trial. (Exhibit 1, 207–208, 216–221, 283, 344–347.) In assessing petitioner's credibility in this matter the Court also considers the fact that many or most of the charges against petitioner in other states have been dropped due to speedy trial problems. Thus, petitioner now might not spend all of his life in jail if for some reason his conviction was reversed and he was charged with and found either innocent or guilty of a lesser included offense. Thus petitioner's original reason for preferring death over life imprisonment no longer exists. (Petitioner's testimony at the evidentiary hearing.)

---

4. Dr. Brown, a psychiatrist, examined petitioner pursuant to an order of the state trial court dated April 18, 1977. He found petitioner was sincere in seeking the death penalty. He testified on June 1, 1983 at the evidentiary hearing on both the issue of electrocution as cruel and unusual punishment and as to petitioner's state of mind as it related to his trial strategy.

19. And based upon petitioner's testimony at the evidentiary hearing the Court will also find that at no time did any state or federal officer, agent, or official coerce the petitioner, mistreat him, or violate any of his rights in any way. Petitioner has at all times been treated courteously and with the utmost respect for his person and constitutional rights. (Exhibit 1; testimony at the evidentiary hearing.)

20. The reason that the petitioner is facing a death sentence is not the result of any peculiarities of the capital punishment statute under which he was tried. Rather, the petitioner is facing a sentence of death as a result of his own criminal conduct and his having adopted a legal strategy, however unwise, which was adopted freely, knowingly, and voluntarily by the petitioner himself for which no other person or factor is responsible. The Court cannot help but note that as attorney Stephens testified at the evidentiary hearing, the petitioner obtained exactly what he wanted.

21. Based upon all of the evidence, the Court finds beyond a reasonable doubt that the course of action petitioner followed at the pretrial, trial, sentencing, and initial appellate stages of the Alabama court system was not caused by or influenced by any aspect of Alabama's capital punishment statute or the sentence alternatives available under it. The Court believes that the petitioner would have followed the same course of action no matter how Alabama's capital punishment statute had been drawn or structured. The Court further finds that beyond a reasonable doubt petitioner was not prejudiced by the "preclusion clause" as it pertained to his trial tactics.

C. Sentencing Procedures

22. At the time petitioner and Evans began their cross country spree, petitioner was on parole for robbery. (Exhibit 1, 243, 338). The crime spree lasted about two-and-a-half months and involved approximately three dozen felonies. Under oath in front of the Grand Jury, petitioner testified his "vocation" was armed robbery because it was easy and he was good at it. (Exhibit 1, 347). At trial he testified under oath that if he were ever freed he would pursue the life of a professional criminal and that, "if it became necessary, I would [kill again]." Exhibit 1, 221).

23. Petitioner failed to show any remorse prior to or during his sentencing. In fact [as will be noted many times in the course of this opinion] he in effect boasted that he would have shot Edward Nassar if necessary, and would kill again in the future if allowed to go free. (See Exhibit 1, 217–221, 340–345).

24. At every stage of the state trial court proceedings petitioner actively sought the death sentence. (See Findings of Fact 9–21, *supra*). He filed a written "Request to Enter Guilty Plea" which was admitted into evidence and went to the jury." (Exhibit 1, 207–208, 252, 283). He took the stand and admitted all elements of the capital offense, and threatened the jurors with harm if they did not convict him and sentence him to death. (Exhibit 1, 216–221). At the time he threatened the jury, he was smiling or grinning and appeared to be menacing and extremely dangerous. (Exhibit 2, Video tape of Trial Testimony).[5]

25. Following the testimony of petitioner, and similar testimony by his co-defendant John Lewis Evans (Exhibit 1, 211–216), the jury retired for deliberations, and within fifteen minutes returned a verdict of guilty. At that time under Alabama law the guilty verdict in a capital murder case also "fixed" petitioner's sentence at death. (Exhibit 1, 29, 226–227). Petitioner gave the "thumbs up" gesture of approval upon hearing the verdict. (Exhibit 2).

26. In addition to the evidence which was presented during the guilt stage of the trial, at the sentencing hearing the State introduced the following: The Grand Jury

---

**5.** Substantial portions of the trial were televised pursuant to Alabama law and stipulations entered into by the defendants and the prosecutor. (Exhibit 1 at 92–93, 254–257.) Petitioner's testimony was highly inflammatory and obviously calculated to arouse the jury into convicting him. For the full flavor of his testimony see Exhibit 1, 216–221 and Exhibit 2. Portions of petitioner's testimony are more fully excerpted in these Findings, *infra,* Part E.

**1508**

testimony of petitioner and Evans; petitioner's prior record; an additional lengthy confession petitioner gave the FBI which recounted his many criminal activities; a summary of the crime spree based on their statements to Mobile police officers; and a number of warrants received from other states indicating that they would attempt to extradite and prosecute petitioner if he was not sentenced to death in Alabama. (Exhibit 1, 229–233). All of this additional evidence was presented without objection. (Exhibit 1, 231–233.) Petitioner submitted no evidence at the sentencing hearing.

27. After deliberation, the trial court entered written findings concerning the aggravating and mitigating circumstances. (Exhibit 1, 243–247.) The Court found the following four aggravating circumstances in petitioner's case:

(a). The Court finds that the Capital Felony was committed by Mr. Ritter while he was under sentence of imprisonment although he was serving the remainder of his sentence on parole at the time;

(b). The Court finds that Mr. Ritter has been previously convicted of another felony involving the use or threat of violence to the person: to-wit: the offense of robbery;

(c). The Court finds that Mr. Ritter has knowingly on approximately thirty-nine previous occasions created a great risk of death to many persons;

(d). The Court finds that the Capital Felony was committed while Mr. Ritter was an accomplice in the commission of a robbery;

(Exhibit 1, 243–244.) The trial court found one statutory mitigating circumstance: age at the time of the crime (23 years old); and one non-statutory mitigating circumstance: the fact that no attempt was made to harm Mr. Nassar's two young daughters who were present when their father was murdered. (Exhibit 1, 246.) The Court found that the aggravating circumstances "far outweigh" the mitigating circumstances; adjudged petitioner guilty of the capital offense charged in the indictment; "and specifically of intentionally killing Edward A. Nassar during the robbery or attempt

thereof;" and sentenced him to death. (Exhibit 1, 246–247.)

28. On direct appeal the Alabama Court of Criminal Appeals considered and upheld the propriety of the death sentence for petitioner and his co-defendant Evans. In doing so that court held:

The aggravating circumstances were here averred and proved at trial, and also determined by the trial judge in a public hearing, as required by law.

In addition, this Court has weighed the aggravating and mitigating circumstances independently.

As stated by Harris, J., in *Jacobs* [*v. State,* 361 So.2d 607 (1977)], *supra,*

'The aggravating circumstances found by the trial court are amply supported by the evidence in this case. The verdict of the jury is overwhelmingly sustained by a preponderance of the evidence.'

Additionally, this Court has weighed the various factors presented by this record, and is of the opinion that the punishment here imposed fits the crime for which each appellant has been found guilty thereof.

*Evans v. State,* 361 So.2d at 662.

29. In its sixth and final decision in this case, the Alabama Supreme Court addressed the sentencing procedure claims which petitioner has raised as Claims No. 3, 4, and 5 of this habeas petition. *Ritter v. State,* 429 So.2d 928 (Ala.1983). In doing so, the Alabama Supreme Court stressed that, "[t]he uniqueness of the facts of Ritter's case merit particular emphasis ..." and after considering those facts it concluded that: "[w]e in nowise find the sentencing procedure here provided and employed, prejudicial to Ritter." *Id.* at 935.

30. At the evidentiary hearing held in this habeas petition, petitioner's own trial counsel testified that in his opinion petitioner would still have been sentenced to death even if the mandatory jury verdict form requirement had not existed. (Testimony of attorney Stephens at the evidentiary hearing.)

31. Based upon a careful examination of the state trial court record and consideration of the testimony presented at the evidentiary hearing in this case this Court finds beyond a reasonable doubt that there is no evidence that petitioner was harmed or prejudiced in any way by the existence of the mandatory jury verdict form requirement or any other aspect of the sentencing procedure employed in this case.

32. Based upon a careful examination of the state trial court record and consideration of the testimony presented at the evidentiary hearing, this Court finds beyond a reasonable doubt that petitioner would still have been sentenced to death even if the mandatory jury verdict form requirement and other aspects of the sentencing procedure about which he now complains had not been employed at his trial.

33. Given the facts and circumstances of this case, including but not limited to the fact that the petitioner threatened to harm the jury if he was not sentenced to death, this Court finds beyond a reasonable doubt that no sentencing authority could reasonably have sentenced petitioner to anything other than death regardless of the sentencing procedure employed.

### D. Jury Charge

34. Petitioner claims that the trial court's jury charge at Exhibit 1, 222–225, was deficient. Both the petitioner and his trial counsel, attorney Stephens, testified at the evidentiary hearing that petitioner freely and voluntarily instructed his trial counsel not to object to any major points at trial, not to "muddy the water," and not to submit any written requested jury instructions to the trial court judge. Petitioner did not object to the jury charge at the time of the trial, nor did he submit any written requested jury charges. (Exhibit 1, 225–226.) Based upon the testimony of the petitioner and attorney Stephens, the Court finds beyond a reasonable doubt that the sole reason for the failure of the petitioner to object to the jury charge at the time of trial and to submit any requested jury charges was that the petitioner had instructed his attorney not to do so.

### E. Intent

35. Petitioner also claims that his sentence of death is disproportionate because he did not kill, attempt to kill, or intend to kill Edward Nassar. All of the testimony at all stages of these legal proceedings indicates that petitioner neither killed nor made an actual attempt to kill Edward Nassar. Conversely, as discussed below, all testimony up to the evidentiary hearing on his habeas petition has been to the effect that petitioner had the requisite intent to kill.

36. In all or virtually all of the more than three dozen violent felonies that he and Evans committed during their two-and-a-half month long crime spree, petitioner was armed with a loaded, deadly weapon. (Exhibit 1, 212–213, 324, 339–340; testimony of petitioner at evidentiary hearing.) And although it is true that Evans shot Edward Nassar, at the time of the shooting petitioner was loading or had loaded a pistol with live ammunition for use in the robbery. (Exhibit 1, 221, 346; testimony of petitioner at evidentiary hearing.)

37. On March 8, 1977, petitioner, after being advised of his *Miranda* rights and freely and voluntarily waiving them, voluntarily admitted to FBI agents in Little Rock, Arkansas that he would have shot and killed Edward Nassar if Evans had not done so first. (Testimony of Agents Hardin and Juel at the evidentiary hearing.)

38. On April 4, 1977, petitioner voluntarily appeared before the Mobile County Grand Jury, and against the advice of his attorney freely testified at length concerning his participation in the robbery and murder of Edward Nassar. (Exhibit 1, 338–347.) During his testimony in front of the Grand Jury the petitioner was asked:

Q: Uh, were you there, uh, to stand ready and assist and aid John Evans in any way that was necessary to accomplish the armed robbery?

A: Yes.

Q: And that went as far as shooting Edward Nassar had you had the opportunity?

A: Yes.

(Exhibit 1, 341.)

Q: Uh, if you ever had to shoot someone in an armed robbery, would you have done so?

A: If it was a choice between them and me, I would've.

Q: Alright. Did both you and John make a pact together or agreement together to assist and aid each other under any set of circumstances and if it meant taking a life, would you do so?

A: Yes.

(Exhibit 1, 343–44.)

Q: Uh, yet you would kill an individual if it became necessary to—to escape or to assist your accomplice, John Evans?

A: Yes, I would.

Q: If you were given the opportunity to be turned back onto the streets or go back free, uh, what occupation would you pursue?

A: Probably robbery.

Q: And, uh, if it became necessary to kill other individuals in that occupation would you do so?

A: Yes.

(Exhibit 1, 344–45.)

39. At his arraignment on April 18, 1977, petitioner plead guilty to the indictment charging him with the capital offense. (Exhibit 1, 27, 59–60.) Petitioner's guilty plea was accepted (Exhibit 1, 27.), but in full compliance with the requirements of the subsequent decision in *Prothro v. State,* 370 So.2d 740 (Ala.Cr.App.1979), the trial court ordered the matter submitted to a jury. (Exhibit 1, 60.) And at petitioner's trial, which began on April 26, 1977, after the state had presented its case, petitioner filed a written "Motion to Enter Guilty Plea" which was admitted into evidence and which went to the jury. (Exhibit 1, 207–208, 252, 283.)

40. Petitioner also took the stand, against the advice of his attorney, and admitted each of the elements of a capital offense. (Exhibit 1, 216–221.)

41. On direct examination the petitioner testified as follows:

A: ... the plan was that I was to ask to see a pistol. I had some .38 caliber ammunition in my left hand, and we went in, I asked Mr. Nassar to see the gun, he handed it to me, I opened it up, looked at it, John started to draw his gun, and I started loading the pistol he showed me. Immediately, Nassar dropped down and started going around the corner, which was an "L" shape, the counter, then towards the office. He got to the office, reached up with, I believe, his left hand, to a counter or something, and that's when he was shot. We knew he was going for a gun. He wouldn't have hesitated to kill us, so he had to be killed. There was no other way....

Q: Mr. Ritter, do you want to say anything to these people sitting on the jury box as to what you want them to do when they get back there?

A: Well, I think there are two considerations. First, we did kill Mr. Nassar. We knew we might have to kill somebody during any robbery. We had discussed it before. If anybody went for a gun, that was what was going to happen....

(Exhibit 1, 219–220.)

42. And during petitioner's testimony at his state court trial, he testified as follows on cross-examination:

Q: I noticed in your confession (given to the Mobile Police Department) where you said you wouldn't say who shot Mr. Nassar, is that correct?

A: That's correct.

Q: I want you to turn and look at the Jury, if you will, Mr. Ritter, and tell that jury if you had an opportunity, to kill Mr. Nassar, would you have killed him?

A: My gun was loaded, and I would have killed him, yes.

Q: You stood ready to assist your cohort in crime in anyway you could, and

that went as far as shooting Mr. Nassar in the back if you had to do so.

A: Yes. John was in my line of fire, but I was there in case he missed.

Q: And if you walked out of this courtroom here today, or if you were ever allowed to walk out of any courtroom, any penitentiary from now until any time in the future, what profession would you start back into?

A: Armed robbery.

Q: And if you had to kill again, would you do it?

A: If it became necessary, I would.

(Exhibit 1, 221.)

43. During its oral charge to the jury, the trial court instructed the jury that petitioner could not be convicted of the capital offense unless he had, "an actual or positive intent to kill." (Exhibit 1, 223) The jury convicted petitioner of the robbery-intentional killing capital offense and the trial court judge adjudged petitioner guilty of the capital offense, "and specifically of intentionally killing Edward A. Nassar during the robbery or attempt thereof." (Exhibit 1, 246.)

44. Following an affirmance of the petitioner's conviction and sentence by the Alabama Court of Criminal Appeals in *Evans v. State,* 361 So.2d 654 (Ala.Cr.App.1977), the Alabama Supreme Court granted *certiorari* as a matter of right pursuant to Alabama Rule of Appellate Procedure 39(c). The Alabama Supreme Court issued an opinion remanding petitioner's case to the Court of Criminal Appeals for consideration of the non-triggerman issue which the Court of Criminal Appeals had not previously addressed. *Evans v. State,* 361 So.2d 666 (Ala.1978).

45. On remand, the Court of Criminal Appeals again upheld petitioner's conviction and sentence even though petitioner did not actually fire the shot that killed Mr. Nassar. *Ritter v. State,* 375 So.2d 266, 267 (Ala.Cr. App.1978). The court held that under Alabama's capital punishment statute the felony murder doctrine could not be used to supply the requisite intent to kill, and held

that it was not used in petitioner's case. *Id.* Instead, the Court explained:

> In brief, it was really simply a matter of logistics that Ritter did not also fire his weapon, i.e., his companion Evans, according to his own statement, was in his line of fire.
>
> In our original opinion, and in this extension this court had carefully reviewed all of the evidence and did not, and does not now, rely upon the felony murder doctrine to imply evidence of intent on the part of Ritter in this cause.
>
> To the contrary, Ritter's active participation in the Nassar murder supplies the requisite intent for an intentional killing necessary under Section 13–11–2(a), Code of Alabama, 1975, which is the aggravated offense of robbery when the victim is *intentionally* killed by the defendant.

*Id.* (Emphasis in original.)

46. In a separate concurrence, Judge Bookout, of the Court of Criminal Appeals, stated:

> I believe the facts of the instant case bring the appellant within the capital felony statute via the accomplice statute. He could be charged equally with Evans for the murder of Edward Nassar even though he did not personally fire the weapon. In planning the robbery, Evans and Ritter had discussed that they might have to kill someone during the course of the robbery. Ritter stated that he would have shot Nassar if Evans had not been in his line of fire. Each would therefore be guilty equally under the accomplice statute. *Howell v. State,* Ala.Crim.App., 339 So.2d 138 (1976).

375 So.2d at 269.

47. Following remand, the case once again returned to the Alabama Supreme Court. After examining the record, the Alabama Supreme Court found that the felony murder doctrine had not been used to convict Ritter of a capital offense and that the evidence established that Ritter possessed the requisite intent to kill:

> From the foregoing it is clear that the felony-murder doctrine was not used in this trial. (Indeed, it was never even

mentioned.) Instead, Ritter could be convicted and sentenced to death under our capital felony statute as an accomplice in the intentional killing of Nassar. (There was also evidence from which the jury could have found that Ritter, aside from his status as an accomplice, had particularized intent to kill....) The question then becomes, did the State prove that Ritter was an accomplice to the intentional killing? We think that it did. Through Ritter's confession and again through his voluntary statements at trial the State showed that Ritter and Evans had a prior agreement that anyone that attempted to go for a gun would be killed. This possibility was discussed beforehand and planned for. As Ritter himself stated, the only reason he did not shoot Nassar himself was because Evans was in the way. Clearly Ritter encouraged and supported the killing and was present with Evans' knowledge to render assistance should it become necessary.

*Ex Parte Ritter,* 375 So.2d 270, 274–275 (Ala.1979). Thus, both the Alabama Court of Criminal Appeals and the Alabama Supreme Court have made factual findings that under Alabama law the petitioner had the legally requisite intent to kill.

48. And in *Ritter v. State,* 375 So.2d at 275 (Ala.1979), the Alabama Supreme Court also considered and addressed the disproportionality issue:

Ritter also contends that the death penalty is a disproportionate sentence in light of his involvement in the capital felony and therefore violates the Eighth and Fourteenth Amendments. Ritter attempts to bolster his position by portraying himself as a mere accomplice to the robbery, "a minor participant" in a crime which led to a killing by someone else. The record, however, refutes this description of Ritter's part in the crime at every point. It was Ritter, not Evans, who asked to see a .38 caliber Colt revolver, who began to load it with ammunition he had brought with him specifically for this purpose, and who carried the revolver out of the pawn shop after Nassar was shot. Thus Ritter could not seriously be considered a "minor participant" in the rob-

bery, and, as we have noted above, he was clearly an accomplice to the killing.

With this more accurate description of Ritter's participation in the intentional killing and robbery in mind we must consider whether the death penalty is a disproportionate sentence for an accomplice to the killing. This is a question which has not yet been decided by the United States Supreme Court, although several cases before the Court have raised the issue.... In each of these cases the court reversed on other grounds. It did not reach the issue of disproportionality. While we opine that there may be situations where an accomplice's participation is so minor that the death penalty would be constitutionally impermissible, such is not the case here. As the trial judge stated, Ritter's participation was not relatively minor. The Court of Criminal Appeals agreed, and so do we. Ritter stands at the most culpable end of the spectrum of accomplice liability. He is closer to an individual who fires a non-fatal shot in a killing rather than one who waits outside as a lookout. By Ritter's own statement it was mere fortuity which made John Evans the triggerman and not Ritter. Consequently, we see no constitutional infirmity in imposing the death sentence in this case. (Citations omitted)

Thus, the Alabama Supreme Court again reiterated its findings that petitioner possessed the requisite intent to kill Mr. Nassar and would have killed him had Evans not done so, and, accordingly, his sentence of death was not disproportionate.

49. In addition to the factual findings of the Alabama Appellate Courts, this Court, based upon the evidence adduced at the hearing, finds independently beyond a reasonable doubt that petitioner intended the death of Mr. Nassar. The Court finds particularly compelling the evidentiary hearing testimony of FBI Agents Hardin and Juel. Both testified that the petitioner told them in an interview on the day following his capture that he (petitioner) would have killed Mr. Nassar if Evans had not done so. This testimony, which was apparently not presented at petitioner's trial, adds consid-

erably to what was, until petitioner's testimony at the evidentiary hearing, uncontested evidence of petitioner's intent as it relates to the death of Mr. Nassar. In assessing petitioner's veracity on his testimony at the evidentiary hearing as to his intent, the Court cannot but be aware that his denial of any intent to kill Mr. Nassar was made more than six years after his trial and in the face of death by electrocution. His motives in changing his story at this late date are obvious, and the Court simply does not believe him. (See also Fact 18, *re:* detainers in other states.) Accordingly, the Court finds beyond a reasonable doubt, based upon the testimony of FBI Agents Hardin and Juel, as well as petitioner's statements and testimony in the state criminal proceedings prior to the evidentiary hearing, that petitioner and Evans had an agreement to aid each in the commission of any crimes they carried out, including the killing of any persons if necessary; and pursuant to this general agreement that petitioner stood ready and able to kill, if necessary, in the robbery of Mr. Nassar's pawn shop; and that John Evans was aware of petitioner's support; indeed, he would have killed Mr. Nassar if required; and that the only reason why he did not do so is that John Evans relieved him of the burden. In essence, petitioner was not so much a non-triggerman, but was rather an unneeded triggerman.

## III. CONCLUSIONS OF LAW

Petitioner alleges ten claims upon which he believes habeas relief ought to be granted. The Court addresses them in the order they are presented and concludes that each of the claims is without merit.

A. *Preclusion Clause.* In Claim 1 (Para. 47–62) petitioner asserts that he was prejudiced by the 1975 Alabama Capital Punishment Statute which contained a lesser included offense "preclusion clause." *Code of Alabama,* 1975, Section 13–11–2(a) provided:

(a) If the jury finds the defendant guilty, it shall fix the punishment at death when the defendant is charged by indictment with any of the following offenses and with aggravation, which must also be

averred in the indictment, *and which offenses so charged with aggravation shall not include any lesser offenses.* (emphasis added)

That clause was found to be constitutionally infirm in *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

Petitioner claims this clause prejudiced him in two ways. First, he claims that the "preclusion clause" was a factor in his decision to adopt a trial strategy which resulted in his receiving a death sentence. *See Hopper v. Evans,* 456 U.S. 605, 613–14 & *; 102 S.Ct. 2049, 2054 & *; 72 L.Ed.2d 367, 374 & *. More specifically, he claims that because of his knowledge of the "preclusion clause", he knew that he would be charged with a capital crime, and not some kind of lesser included offense, and that in Alabama a person convicted of a capital crime must be sentenced to death or life imprisonment without parole. He was, he claims, certain that given the circumstances of his crime, he would be convicted of a capital offense. He goes on to allege that given a choice between life in prison and death, he preferred death. As a result he adopted a trial strategy insuring that he would be convicted and sentenced to death. He further claims that had it not been for the "preclusion clause", he would have adopted a different trial strategy in which he would have waged a vigorous defense. Petitioner's second claim is that regardless of his trial strategy, based upon the evidence adduced at his trial, he should have received an instruction on the lesser included offense of felony murder. Such an instruction could not be given because of the "preclusion clause".

■ 1. *Trial Strategy.* This Court has already found as fact that not only was petitioner unaware of the preclusion clause at the time he decided to adopt a trial strategy insuring the death penalty, but rather his decision to adopt such a strategy was the result of the many felonies which he had committed and confessed to in interviews with FBI agents. (Findings of Fact 2–21.) As a result of his confession to those many other crimes, plus the likelihood of a

conviction for a serious offense in Alabama, petitioner knew that he would spend the rest of his life in jail; and this prospect was more onerous to him than death. It was for this reason, not any aspect of the "preclusion clause", or any other aspect of Alabama's substantive or procedural criminal law, that petitioner decided to seek the death penalty. Thus, the Court has found that petitioner's decision to adopt a trial strategy, in which on several occasions he freely confessed to the crime of murder, and in which he testified in front of the grand jury and during the trial, was not in any way related to the "preclusion clause". The Court, therefore, concludes beyond a reasonable doubt that petitioner was not prejudiced in any fashion by the "preclusion clause" as it may have related to petitioner's trial strategy. *Hopper, supra;* and *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[6]

■ 2. *Lesser Included Offense Instruction.* The essence of this claim is that petitioner gave four separate statements related to his culpability in the murder of Edward Nassar before or during his trial. He further claims that in two of them, one made to the FBI (Exhibit 1 at 303–04), and another to the Mobile Police Department (Exhibit 1 at 192–94) there was evidence indicating that he did not intend the death of Edward Nassar. Accordingly, he argues, he was entitled to an instruction on the lesser included offense of felony murder as a matter of both Alabama[7] and Federal constitutional law.[8]

The petitioner in *Beck, supra,* 447 U.S. at 629–630, 100 S.Ct. at 2385–86, 65 L.Ed.2d at 398, admitted robbing one Roy Malone, but

> Consistently denied, however, that he killed the man or that he intended his death. Under petitioner's version of the

events, he and his accomplice entered their victim's home in the afternoon, and, after petitioner had seized the man intending to bind him with a rope, his accomplice unexpectedly struck and killed him. As the State has conceded, absent the statutory prohibition on such instructions, this testimony would have entitled petitioner to a lesser included offense instruction on felony murder as a matter of state law.[9]

Based upon these facts, the United States Supreme Court in *Beck* struck down the lesser included offense preclusion clause, holding that a sentence of death may not be constitutionally "imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and ... *when the evidence would have supported such a verdict ....*" (emphasis added) 447 U.S. at 627, 456 S.Ct. at 2384, 65 L.Ed.2d at 396.

In *Hopper v. Evans,* 456 U.S. 605, 606, 102 S.Ct. 2049, 2050, 72 L.Ed.2d 367, 369–70 (1982), the United States Supreme Court "granted *certiorari* to determine whether after invalidation of a state law which precluded instructions on lesser included offenses in capital cases, a new trial is required in a capital case in which the *defendant's own evidence* negates the possibility that such an instruction might have been warranted." (emphasis added) The Court in limiting its holding in *Beck, supra,* held in the negative: "... due process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans,* 456 U.S. at 611, 102 S.Ct. at 2053, 72 L.Ed.2d at 373. (emphasis in original) The court went on to hold that the Alabama rule on entitlement

---

**6.** See discussion of the constitutional harmless error rule, Section III C, *infra.*

**7.** *See, e.g.,* "Every accused is entitled to have charges given which would not be misleading, which would correctly state the law of his case and which are supported by any evidence, however weak, insufficient or doubtful in credibility." *Chavers v. State,* 361 So.2d 1106, 1107 (Ala.1981); and *Fulghum v. State,* 277 So.2d 886, 890 (1973).

**8.** *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**9.** This case differs from *Beck* in that Ritter, until the evidentiary hearing, never denied that he intended Edward Nassar's death, indeed, his testimony was exactly the opposite. Intent was never an issue at Ritter's trial. *See Beck,* 447 U.S. at 629, 100 S.Ct. at 2386, 65 L.Ed.2d at 398.

to a lesser included offense instruction does not offend federal constitutional standards. *Id.* [10] 456 U.S. at 612, 102 S.Ct. at 2053, 72 L.Ed.2d at 373.

Following an analysis of Evans' testimony, the *Hopper* Court concluded that Evans had the requisite intent to kill, and that he had suggested "no plausible claim which he might conceivably have made, had there been no preclusion clause, that is not contradicted by his own testimony at trial." *Id.* 456 U.S. at 613, 102 S.Ct. at 2054, 72 L.Ed.2d at 374. In an accompanying footnote, the Court stated that no plausible claim of prejudice could be made because Evans " ... confessed that he shot the victim and then pleaded guilty to capital murder." (*Id.*)

On remand from the United States Supreme Court, the Alabama Supreme Court addressed the lesser included offense instruction issue in petitioner's case in light of *Hopper* and concluded that petitioner, like Evans, "affirmatively negated any claim that he did not intend to kill the victim. An instruction on the offense of felony-murder, or any other lesser offense, was therefore not required. Consequently, we find the preclusion clause did not prejudice respondent in any way and a new trial is not warranted". *Ritter v. State,* 429 So.2d 928, 933 (Ala.1983).

The basis for that conclusion of law had been explained earlier in *Ex Parte Ritter,* 375 So.2d 270 (Ala.1979). In that case the Alabama Supreme Court, following remand to the Alabama Court of Criminal Appeals, determined that under the evidence produced at trial, petitioner had legally sufficient intent to be convicted of capital murder.[11] That determination was based on three factors: petitioner's testimony at his trial; "accomplice liability" under Alabama law as interpreted by the Alabama Supreme Court; and the distinction under Alabama law between accomplice liability and the felony murder doctrine.

**10.** See footnote, 7, *supra.*

**11.** See *Ritter v. State,* 375 So.2d 266 (Ala.Cr. App.1978), in which the Court of Criminal Ap-

The Alabama Supreme Court first noted that under the capital felony statute evidence of intent could not, pursuant to *Code of Alabama,* 1975, Section 13–11–2(b), "be supplied by the felony-murder doctrine." *Id.* at 273. Under felony-murder,

> It is not necessary that the individual accused of murder should have contemplated, intended, or willed the death of the victim .... Culpability stems instead from the accused's participation in an inherently dangerous felony—one in which he should have known that there was a substantial possibility that someone would be killed.

*Id.* at 273–74. In Alabama felony-murder is a non-capital crime punishable by life imprisonment. *Id.* at 274. The court stated, "as one commentator has observed, '[T]he death penalty is an untenable sanction for negligent or accidental homicide.'" *Id.*

But as the court went on to hold, petitioner's intent was not supplied by the felony-murder doctrine:

> The legislature did, however, indicate that an accomplice in a capital felony could be sentenced to death under our statute, for it included accomplice liability as a factor to be considered during the sentencing hearing under both aggravating circumstances, § 13–11–6(4), and mitigating circumstances, § 13–11–7(4). The significant distinction between use of the felony-murder doctrine and use of accomplice liability in this context is that accomplice liability requires a greater showing of the defendant's individual intent. Under Alabama law, in order to hold an individual as an accomplice the State must prove that he aided and abetted in the crime, terms which " 'comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.'" *Jones v. State,* 174 Ala. 53, 57 So. 31 (1911). As we noted in *Jones,* key ele-

peals held Ritter could be convicted under the theory of accomplice liability. See also Findings of Fact 46 and 47, *supra.*

ments of accomplice liability are *encouragement* or presence "with a view to render aid should it become necessary." When liability is predicated on the latter it is essential that the principal be aware of the accomplice's support and willingness to lend assistance. *Jones, supra.* Thus an accomplice while he may not have actually committed the crime by delivering the blow or firing the shot, has sanctioned and facilitated the crime so that his culpability is comparable to that of the principal. In Alabama, as in many states, this premise is statutorily recognized in § 13–9–1 which abolished the old common law distinctions among accessories before the fact, principals in the second degree and principals in the first degree and provides that "... all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense or aid or abet in its commission, though not present, must hereafter be indicted, tried and punished as principals...."

From the foregoing it is clear that the felony-murder doctrine was not used in this trial. (Indeed, it was never even mentioned.) Instead Ritter could be convicted and sentenced to death under our capital felony statute as an accomplice in the intentional killing of Nassar. (There was also evidence from which the jury could have found that Ritter, aside from his status as an accomplice, had the particularized intent to kill. Of course, it is not contended that Ritter is not fully liable as a principal for the robbery.) The question then becomes, did the State prove that Ritter was an accomplice to the intentional killing? We think it did. Through Ritter's confession and again through his voluntary statement at trial the State showed that Ritter and Evans had a prior agreement that anyone who attempted to go for a gun would be killed. This possibility was discussed beforehand and planned for. As Ritter himself stated, the only reason he did not shoot Nassar himself was because Evans was in the way. Clearly Ritter encouraged and supported the killing and was present with Evans' knowledge to render assistance should it become necessary. *Id.* 274–75.

An analysis of the four separate statements given by the petitioner before and during his trial indicates there are no contradictions between his earlier statements and his trial testimony as they relate to "accomplice liability". (This Court has already stated in the Findings of Fact why it gives no credence to petitioner's exculpatory testimony at the evidentiary hearing.) Petitioner's statement given to the FBI on March 8, 1977, as it pertained to the murder of Edward Nassar, was cursory and part of a long inventory of crimes committed by him and John Evans during their crime spree. (Exhibit 1, 303–304.) Petitioner's statement given to the Mobile Police Department is sketchy and void of any discussion on the issue of intent, *Id.* 192–194, and was in effect disclaimed by him at trial. (Exhibit 1, 221, and see Finding of Fact 42.)

It is in his testimony before the Grand Jury in which he gives evidence relevant to intent and first states he would have shot Edward Nassar, *Id.* at 340, if he had the opportunity. *Id.* at 341. When asked if he was there "... to stand ready and assist and aid John Evans in any way that was necessary to accomplish the armed robbery," he replied, "Yes." *Id.* at 341. And that included the shooting of Edward Nassar. *Id.* When asked if he ever "had to shoot someone in an armed robbery, would you have done so?" he replied, "If it was a choice between them and me, I would've." *Id.* at 343. Furthermore, he and Evans had entered into a pact to assist each other under any circumstances including the taking of a life. *Id.* at 344. When asked by one of the members of the Grand Jury if he had ever killed anyone, he replied, "Other than Mr. Nassar, no." *Id.* at 347. And, "Uh, well, really, under the law it doesn't matter whether I pulled the trigger or not, I was there and I would have ...." *Id.* His trial testimony was even more explicit. (*See* Exhibit 1, 216–221 and Exhibit 2: Video tape of Trial Testimony)

Nowhere is there any conflict between these four statements. When viewed as a whole, the evidence is uncontested that petitioner had confessed to all of the elements necessary for conviction of capital murder under the theory of accomplice liability as interpreted by the Alabama Supreme Court.[12] Accordingly, this Court concludes that as a matter of Alabama state law there was no basis in the evidence for an instruction on a lesser included offense. *Chavers v. State* and *Fulghum v. State*, n. 7 *supra.* This Court further concludes beyond a reasonable doubt that under federal constitutional law, where petitioner, as here, has negated any possibility that an instruction on a lesser included offense be given through his own testimony at trial and guilty plea, he has not been prejudiced within the meaning of *Beck v. Alabama, supra,* as limited by *Hopper v. Evans, supra.* See also discussion of constitutional harmless error rule at Section III C, *infra.* [13]

B. *Inadequacy of Jury Charge.* Petitioner's Claim 2 asserts that the jury charge given by the trial judge during the guilt phase of the trial was perfunctory and inadequate. This Court has found as fact that petitioner's attorney failed to object to the jury charge at the time of trial, and also failed to submit any proposed written jury instructions. This Court has also found as fact that said failure to object to the jury charge was solely the result of petitioner's decision to adopt a trial strategy in which he would seek the death penalty, and that

said strategy was in no way a product of the Alabama preclusion clause. The Alabama Courts have ruled petitioner was adequately and professionally represented, and petitioner has not challenged that ruling in this petition. *Evans v. State,* 361 So.2d at 661–662 (1977).

■ Under Alabama law, an error of commission (misstatement of law) in the oral charge to the jury is waived unless a timely and specific objection is made to it in the trial court. See *Hill v. State,* 409 So.2d 943, 944 (Ala.Cr.App.1981), *cert. den.,* No. 81–196 (Ala.1982), in which the Alabama Court of Criminal Appeals stated, "Appellant made no exception to the trial court's oral charge." Similarly, in *Pinkard v. State,* 405 So.2d 411, 416 (Ala.Cr.App.1981), the court held, "The law is well settled in Alabama that when a defendant makes no exceptions or objections to the oral charge, this court cannot review the issue of asserted jury instructions."

■ The law is identical in Alabama on errors of omission (failure to charge on a necessary point). Such errors are waived unless a proper written requested instruction is tendered to the trial court on the omitted point:

> [w]here a party desires the court to extend its oral charge to cover some applicable law in the trial of a case, his remedy is to request a written charge on the subject, which if refused would protect

---

**12.** And as the Alabama Supreme Court noted in *Ex Parte Ritter,* there was also evidence at the trial that Ritter had the particularized intent to kill. *Ex Parte Ritter,* 375 So.2d at 274.

**13.** Although petitioner does not specifically raise the issue, the Court concludes for the same reasons that Ritter was not entitled to be indicted on some lesser charge. Petitioner, following discussions with the Mobile District Attorney, decided voluntarily and knowingly to testify in front of the Grand Jury. Exhibit 1, 338–347. It had been explained to him by the District Attorney that he had the right to a jury, that he did not have to testify, that the burden of proof was on the state. *Id.* at 345. Petitioner's only complaint was that the process was taking too long. *Id.*

Petitioner did not have to testify in front of the Grand Jury; and certainly if he never in-

tended the death of Edward Nassar, or had not made an agreement with John Evans to support his actions during the commission of a crime, including murder, if necessary, he could so have testified. Under that evidence, he might well have received an indictment on some lesser included offense. Instead he admitted the elements of accomplice liability, and demanded the death penalty. On these facts, where petitioner by his own testimony and guilty plea negated the possibility of an indictment on a lesser charge, the Court concludes that beyond a reasonable doubt petitioner was not prejudiced by the "preclusion clause" as it related to the charge under which he was indicted. *Beck v. Alabama* as limited by *Hopper v. Evans,* supra. See also the discussion of the constitutional harmless error rule at Section III C, infra.

the record and present the matter for Appellate Courts ...

A failure to pursue ... the [remedy] above set out, if proper and applicable to the case, is a waiver of a review by this court as to the matters in question.

*Parham v. City of Opelika,* 412 So.2d 1268, 1269 (Ala.Cr.App.1982) (citing *Yates v. State,* 390 So.2d 32, 35 (Ala.Cr.App.1980)). See also *Miller v. State,* 405 So.2d 41, 47 (Ala.Cr.App.1981).

Rule 39(k), Alabama Rules of Appellate Procedure provides:

In all cases in which the death penalty has been imposed, upon review of the opinion of the Court of Criminal Appeals on certiorari, the Supreme Court may notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the Petitioner.

In *Ritter v. State,* 375 So.2d 270, 275–76 (Ala.1979), the Alabama Supreme Court refused to apply the plain error rule to alleged defects in the oral jury charge, both as to the charge of accomplice liability, as it related to capital murder, as well as to the robbery charge. The court held, "In the instant case it is abundantly clear that no injury resulted from the trial judge's omission ..." given petitioner's guilty plea which was knowingly and voluntarily entered, and his knowing and voluntary waiver of any errors in the charge. *Id.* at 276.

■ A state court's holding that there has been a procedural default is binding upon this Court insofar as the issue of whether a state law procedural default has occurred. *Engle v. Issac,* 456 U.S. 107, 134–35 & n. 44, 102 S.Ct. 1558, 1575 & n. 44, 71 L.Ed.2d 783, 804–05 & n. 44 (1982);[14] *Belotti v. Baird,* 443 U.S. 622, 644 & n. 24, 99 S.Ct. 3035, 3049 & n. 24, 61 L.Ed. 797, 814 & n. 24 (1979); *Mendiola v. Estelle,* 635 F.2d 487, 489 (5th Cir.1981).

■ *Engle v. Issac, supra,* and related decisions establish that petitioner's state law procedural default bars him from litigating any jury instruction issues in this Court absent an affirmative showing of both cause and prejudice. Petitioner has the burden of showing both cause and prejudice, *e.g., Sullivan v. Wainwright,* 695 F.2d 1306 (11th Cir.1983), yet he has failed to prove either. Indeed, as noted above and in the Findings of Fact, the only reason why no objections were made and no written instructions submitted was that he ordered his attorney not to do so. Based upon this uncontradicted testimony, and absent a showing of cause, no amount of prejudice will suffice to remove a procedural default bar. *Engle v. Issac, supra,* 456 U.S. at 134 & n. 43, 102 S.Ct. at 1575 & n. 43, 71 L.Ed.2d at 804 & n. 43. (As for Para. 67 and 68 of the petition, this Court has already held petitioner was not prejudiced by the preclusion clause.)

C. *Verdict Form.* Claim 3 (Para. 69–73) is a challenge to the verdict form. *Code of Alabama,* 1975, Section 13–11–2(a) provided that "[i]f the jury finds the Defendant guilty, it shall fix the punishment at death ...." The statute thus on its face possesses the deficiencies of the mandatory death sentence statutes condemned in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976): "Because the jury was given no guidance whatsoever for determining when it should exercise this *de facto* sentencing power, the mandatory death sentence statutes raised the same possibility that the death penalty would be imposed in an arbitrary and capricious manner as the statute held invalid in *Furman." Beck v. Alabama, supra,* 447 U.S. at 640, 100 S.Ct. at 2391, 65 L.Ed.2d at 404. The Court further stated in *Beck:*

The Alabama statute which was enacted after *Furman* but before *Woodson* has many of the same flaws that made the North Carolina statute unconstitutional. Thus, the Alabama statute makes the guilt determination depend, at least in

---

**14.** In footnote 44, Justice O'Connor states, "... [w]e should not rely upon a state plain-error rule when the State has refused to apply that rule to the very sort of claim at issue."

part, on the jury's feelings as to whether or not the defendant deserves the death penalty, without giving the jury any standards to guide its decision on this issue.

*Id.* The Court appears to have addressed the mandatory sentence portion of the statute and found it invalid:

In the final analysis the difficulty with the Alabama statute is that it interjects irrelevant considerations into the fact finding process, diverting the jury's attention from the central issue of whether the State has satisfied its burden of proving beyond a reasonable doubt that the defendant is guilty of a capital crime. Thus, on the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished. On the other hand, the apparently mandatory nature of the death penalty may encourage it to acquit for an equally impermissible reason—that whatever his crime, the defendant does not deserve death. In any particular case these two extraneous factors may favor the defendant or the prosecution or they may cancel each other out. But in every case they introduce a level of uncertainty and unreliability into the fact finding process that cannot be tolerated in a capital case.

447 U.S. at 642–43, 100 S.Ct. at 2392, 65 L.Ed.2d at 406. The "but in every case" language in the quotation was limited and explained in *Hopper v. Evans, supra.*

■ A constitutional error, however, does not merit reversal where the error or defect is harmless beyond a reasonable doubt in view of the facts and circumstances of the case. *See, e.g., Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 709 (1972). That rule applies in capital cases where the defendant has been sentenced to death. See, *e.g., Hopper v. Evans, supra; McCorquodale v. Balkam,* 705 F.2d 1553, 1556 (11th Cir.1983). And the rule applies to errors or defects in the sentencing stage of a capital case. *Ford v. Strickland,* 696 F.2d 804, 815 (11th Cir.1983) (*en banc*) (majority opinion); [15] *Proffitt v. Wainwright,* 685 F.2d 1227, 1269 (11th Cir. 1982).[16]

■ In determining whether a real or assumed constitutional error or defect is harmless beyond a reasonable doubt, a reviewing court must determine "the probable impact" of that error or defect on the decision maker below. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284, 288 (1969). If, upon review of the entire record, the court determines there is no reasonable possibility that the constitutional error or defect might have contributed to the result, then it is harmless beyond a reasonable doubt. *Harrington v. California, supra; Chapman v. California, supra; Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173 (1963). Where a review of the record leaves a court without a doubt that the same decision would have been reached in the trial court had the error or defect not existed, the error or defect is harmless beyond a reasonable doubt. *Milton v. Wainwright,* 407 U.S. 371, 372, 377, 92 S.Ct. 2174, 2175, 2177, 33 L.Ed.2d 1, 4, 6 (1972). A reasonable doubt is a reason in the record, see, *e.g., Johnson v. Louisiana,* 406 U.S. 356, 360, 92 S.Ct. 1620, 1623, 32 L.Ed.2d 152, 158 (1972), and not a vague, speculative, or imaginary doubt. *See, e.g., United States v. Johnson,* 343 F.2d 5, 6 (2d Cir.1965).

**15.** The Eleventh Circuit held that where there was insufficient evidence to support some of the aggravating circumstances found by the trial court, the same result would have been reached even if the impermissible aggravating circumstances had not been considered. And Judge Godbold joined by Judge Black in a special concurrence held, "as a matter of general constitutional policy I think it essential that appellate courts be able to employ a harmless error rule where the initial sentence has found aggravating circumstances to outweigh mitigating circumstances by such a definitive margin." *Id.* at 822–823.

**16.** "Where the factors supporting the death sentence are so clear that proper application of the statute by reasonable persons could produce no other result" a death sentence may be affirmed despite constitutional defects.

**1520**

■ The constitutional defect in this instance is clearly harmless beyond a reasonable doubt. This Court has already concluded that petitioner was not entitled to an instruction on a lesser included offense. See Section III A–2, *supra.* Therefore, the only question confronting the jury was guilt or innocence on the capital murder charge. The verdict form (or mandatory death sentence) would have had no effect on the jury's deliberations, and the constitutional infirmities articulated in *Woodson v. North Carolina* and *Beck v. Alabama, supra,* were not present: no uncertainty or unreliability was introduced into the fact finding process by the mandatory death sentence included on the verdict form.

Second, taken alone, given that there was no entitlement to the lesser included offense instruction, and without regard to Claim 5,[17] the verdict form defect is harmless beyond a reasonable doubt because the jury's "sentence" is merely advisory, and the actual sentence is imposed by the judge whose sentencing decision is constrained by objective standards. Since the actual "sentencing authority" is appropriately guided, the phantom sentence decision by the jury, taken alone, is harmless. See discussion in Section III E, *infra.* See also a description of the procedures under which petitioner was sentenced in *Ritter v. State, supra,* 429 So.2d 935–37, and this Court's discussion of those procedures in *Evans v. Britton,* 472 F.Supp. 707, 717–719 (S.D.Ala.1979.)

Finally, these claims (which also include Claims 4–6) were raised and rejected in *Alabama v. Evans,* —— U.S. ——, 103 S.Ct. 1736, 75 L.Ed.2d 806 (1983) (per curiam). The Supreme Court dismissed these very sentencing procedure claims as having been "conclusively resolved in prior proceedings." *Id.* 103 S.Ct. at 1739.

■ D. *Jury's Failure to Consider Mitigating Circumstances.* Claim 4 (Para. 74–80) is actually composed of parts of Claims 3 (Para. 75–77) and 5 (Para. 78–80). This claim is to the effect that the automatic sentence of death contained in the verdict form is unconstitutional because the members of the jury were unable under the then existing law to consider any mitigating circumstances. Given petitioner's unusual, even self-destructive behavior in front of the jury in which he threatened the jury and admitted his guilt, including making the statement that he would have shot Edward Nassar had not Evans done so, it is inconceivable that a jury would not have recommended the death penalty. *See* Findings of Fact, Part II C, *supra.* Therefore, this Court concludes that this claim is harmless beyond a reasonable doubt. See discussion of constitutional harmless error rule in Section III C, *supra.*

■ E. *Judge's Consideration of Jury's Automatic Death Sentence.* Claim 5 (Para. 81–86) is an attack upon the statutory relationship between the jury and the judge in the sentencing process. Under the statute, as noted *supra,* the jury in finding guilt, simultaneously imposes a death sentence without any choice as to sentencing and without instruction as to aggravating and mitigating factors. As noted *supra,* the statute provided that the actual sentencing decision was to be made by the trial judge based upon, among other things, the aggravating and mitigating circumstances set out in *Code of Alabama,* 1975, Sections 13–11–6 and 7. Section 13–11–4 provides in part:

Notwithstanding the fixing of the punishment at death by the jury, the court, after weighing the aggravating and mitigating circumstances, may refuse to accept the death penalty as fixed by the jury and sentence the defendant to life imprisonment without parole, which shall be served without parole; or the court, after weighing the aggravating and mitigating circumstances, and the fixing of the punishment at death by the jury, may accordingly sentence the defendant to death.

There is, therefore, an express statutory direction that the court consider the phantom death sentence by the jury in determining to conform to that sentence, and an arguable requirement (the first phase of the statute being ambiguous in its effect) that the court also weigh the phantom sentence

---

**17.** See Section III E, *infra.*

by the jury in a decision to commute the sentence to life without parole.

Petitioner contends first that the jury's death sentence is constitutionally proscribed because it is unguided and standardless, and is made simultaneously with the guilt determination, and second, that since this illegitimate sentence must be accorded weight by the trial judge in the actual sentencing determination, the entire sentencing formula is invalid. Additionally, petitioner contends that the public would perceive a commuting judge as having overridden the sentence determination of the jury, when in reality all the jury determined was guilt. Given that Alabama's Circuit Judges are elected, and that capital murder proceedings are widely publicized, petitioner argues, the phantom jury sentence places undue pressure on the trial judge to conform the actual sentence to the verdict.

It should be noted that at least to some extent this claimed constitutional defect in the 1975 statute inheres in the judicially-created post-*Beck* sentencing process and in the present Alabama death penalty statute. Under both schemes, the jury first finds guilt or innocence, without regard to sentence. Then a sentencing hearing, with the jury's decision constrained by statutory factors, is conducted. The trial judge then independently analyzes the statutory factors and either conforms to or overrides the jury's sentence. Even under this scheme, a jury's death sentence arguably pressures the elected judge to conform to it. Presumably the process is made more palatable by the fact that the jury's sentence is a real, controlled sentencing decision, presumptively having greater reliability than its "sentence" under the 1975 act.

The United States Supreme Court has observed that under the 1975 act "it is manifest that the jury's verdict must have a tendency to motivate the judge to impose the same sentence that the jury did." *Beck v. Alabama,* 447 U.S. at 645, 100 S.Ct. at 2393, 65 L.Ed.2d at 402. In making that observation the Court noted the comments of Justice Jones in *Jacobs v. State,* 361 So.2d 607, 650–51 (Ala.Cr.App.1977), regarding the pressures that public scrutiny and the elected nature of the office place on

Alabama's Circuit Judges to conform to a jury's death sentence. 447 U.S. at 645 & n. 22, 100 S.Ct. at 2393 & n. 22, 65 L.Ed.2d at 407 & n. 22, (noting "the practical obstacles to treating the jury's imposition of the death penalty as being purely advisory . . . .")

Petitioner's claim, in the abstract, appears to be substantial. The automatic death penalty, combined with the inclusion of that penalty in the actual sentencing formula and the sentencing judge's position with respect to the public, might in some circumstances prejudice a defendant where the sentencing decision presented a close question. Here, the State argues, the problem was, beyond a reasonable doubt, not prejudicial to this petitioner; and this Court agrees.

Petitioner was tried and sentenced by the highly distinguished presiding Judge of the Circuit Court. That Judge is now deceased. Even were he alive, he could not, under the law of this Circuit, testify regarding the weight, if any, the jury's sentence played in his sentencing determination. *Washington v. Strickland,* 693 F.2d 1243, 1263 (11th Cir. 1982) (*en banc*). In his sentencing opinion, which did not include the jury verdict in his sentencing formula, the Circuit Judge, upon consideration of the statutory aggravating and mitigating circumstances, concluded:

> The court, having considered the aggravating circumstances and the mitigating circumstances and after weighing the aggravating and mitigating circumstances; it is the judgment of the court that the aggravating far outweigh the mitigating circumstances and that the death penalty as fixed by the jury should be and is hereby accepted.

Exhibit 1, 246. Though the Court "accepted" the jury penalty, the statement establishes that it did so upon an independent weighing of the aggravating and mitigating circumstances and that that weighing process did not include the jury's recommendation. Having considered the record in this case, including the Judge's sentencing pronouncement, the total absence of any record evidence that the sentencing

Judge was improperly affected by the jury verdict or public pressure, and this Court's knowledge of the sentencing Judge's tenure of office, position with the state court, and esteem in the community (legal and general), the Court finds that the statute, *as applied in this particular case,* did not prejudice petitioner's rights, and concludes that, beyond a reasonable doubt, his rights were not so prejudiced. (See discussion of the application of the constitutional harmless error rule, Section III C, *supra.*)

■ F. *Cumulative Impact of Sentencing Procedures.* Petitioner's Claim 6 (Para. 87) relates to the cumulative impact of the alleged unconstitutional sentencing procedures. In proceedings under 28 U.S.C. § 2254, the petitioner must plead and prove prejudice from any averred constitutional errors or defects in his state court trial. *See, e.g., Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203, 212 (1978). Federal habeas relief should be limited to cases involving "fundamental miscarriages of justice," *Engle v. Issac, supra,* 456 U.S. at 135, 102 S.Ct. at 1575, 71 L.Ed.2d at 705 (1982); *United States v. Frady,* 456 U.S. 152, 172, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 833 (1982).

In the case at bar, given petitioner's behavior at trial (*See* Findings of Fact at II C), and that the defects alleged were harmless beyond a reasonable doubt (*See* Conclusions of Law at III C, D and E), the Court concludes that the defects alleged in Claims 3–5, either singly or in combination, created no fundamental miscarriage of justice. And the Court so concludes beyond a reasonable doubt. (*See* discussion of constitutional harmless error rule in Conclusions of Law at III C.)

■ G. *Jury Input.* Petitioner's Claim 7 (Para. 88–90) is that the act under which he was sentenced to death is unconstitutional because it did not provide for actual jury input into the sentencing process. There is no constitutional basis for this claim. In *Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913, 923 (1976), the United States Supreme Court stated:

This Court has pointed out that jury sentencing in a capital case can perform an

important societal function, ... but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases. [citations omitted]

Nor has it ever been held that jury input into a capital punishment case is constitutionally required. *See, e.g., Drake v. Zant,* 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 297 (1981) (White, J., dissenting from denial of certiorari); *Richmond v. Arizona,* 434 U.S. 1323, 1325, 98 S.Ct. 8, 9, 54 L.Ed.2d 34, 36–47 (1977) (denial of stay by Rehnquist, J., as Circuit Justice); *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied,* 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); *Jacobs v. State,* 361 So.2d 640, 646 (1978) (separate opinion of Torbert, C.J.).

■ H. *The Third Aggravating Circumstance.* Petitioner's Claim 8 (Para. 91–97) relates to *Code of Alabama,* 1975, Sections 13–11–3 and 13–11–6. Section 13–11–3 provides for a sentencing hearing, and states in pertinent part that upon a finding of guilt in a capital offense,

... the court shall thereupon hold a hearing to aid the court to determine whether or not the court will sentence the defendant to death or to life imprisonment without parole. In the hearing, evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to any of the aggravating or mitigating circumstances enumerated in sections 13–11–6 and 13–11–7 ....

Section 13–11–6 contains eight aggravating circumstances, one of which provides: "(3) The defendant knowingly created a great risk of death to many persons ...."

Following petitioner's conviction of capital murder, the state trial court held the required evidentiary hearing and entered

written findings in which he found four aggravating circumstances and two mitigating circumstances. (Exhibit 1, 30–33.) One of the aggravating circumstances found by the trial court in addressing Section 13–11–6(3) was, "(c) The Court finds that Mr. Ritter has knowingly on approximately thirty-nine previous occasions created a great risk of death to many persons." *Id.* at 30. Thus, the trial court in finding the presence of the third aggravating circumstance, addressed not only the crime for which petitioner was convicted, but his crime spree during the several months prior to and following the murder of Edward Nassar.

Petitioner contends that the consideration of events other than the crime spree itself in applying this factor is erroneous as a matter of statutory construction and therefore introduces into the sentencing formula factors not specifically provided for in the statute. *See Goode v. Wainwright,* 704 F.2d 593 (11th Cir.1983); *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982); *Henry v. Wainwright,* 661 F.2d 56 (5th Cir. 1981), *reinstated,* 686 F.2d 311 (5th Cir. 1982).

The Alabama courts have not articulated the precise extent of permissible consideration as it applies to Section 13–11–6(3).[18] In *Evans and Ritter v. State,* 361 So.2d 654, 662 (Ala.Crim.App.1977), however, the Alabama Court of Criminal Appeals stated:

The aggravating circumstances were here averred and proved at trial, and also determined by the trial judge in a public hearing, as required by law.

In addition, this Court has weighed the aggravating and mitigating circumstances independently.

As stated by Harris, J. in [*Jacobs v. State,* 361 So.2d 607 (1977) ]:

'The aggravating circumstances found by the trial court are amply supported by the evidence in this case. The verdict of the jury is overwhelmingly sustained by a preponderance of the evidence.'

Thus, the Court of Criminal Appeals, although it did not specifically discuss the statutory scope of Section 13–11–6(3), did hold that under Alabama law the trial court in the petitioner's case had correctly performed its duties in finding and weighing the aggravating and mitigating circumstances. The Court of Criminal Appeals also went on to independently consider the aggravating and mitigating circumstances and arrived at the same conclusion as the trial court.[19]

This identical claim was presented by petitioner's co-defendant, John Louis Evans, to the United States Supreme Court in *Alabama v. Evans,* —— U.S. ——, 103 S.Ct. 1736, 75 L.Ed.2d 806 (1983). The Supreme Court in considering Evans' claim stated:

*Proffitt,* however, does not address the question whether this particular aggravating factor may be applied to acts unrelated to the capital offense itself. The decision in that case only applies the principal established in *Godfrey v. Georgia,* 446 U.S. 420, 120 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that aggravating factors must be construed and applied in a nonarbitrary manner. On the facts of respon-

---

**18.** On June 13, 1983, petitioner filed a motion with this Court requesting that it certify a question to the Alabama Supreme Court. The proposed question is whether Section 13–11–6(3) applies "to conduct of the defendant which is unrelated to the capital felony for which he is being sentenced." For the reasons discussed in this section, this Court believes that question has been answered, and petitioner's motion will be denied.

**19.** The Alabama appellate courts have unwaiveringly held that erroneous consideration of an aggravating circumstance vitiates a death sentence regardless of the number of other aggra-

vating circumstances properly found and considered by the sentencing judge. *See, Ex Parte Bracewell,* 407 So.2d 845, 847 (Ala.1979); *Ex Parte Johnson,* 399 So.2d 873, 874 (Ala.1979); *Cornelius Singleton v. State,* No. 1 Div. 361 (Ala.Cr.App. Feb. 1, 1983) manuscript op. at 11–12; *Morrison v. State,* 398 So.2d 730, 748 (Ala.Cr.App.1979). It would therefore appear that had the Alabama appellate courts concluded that the third aggravating factor had been improperly applied in this case, they would have done as in all prior cases in which an aggravating circumstance was erroneously found by the trial court and remanded for a new sentence hearing.

dent's case, there was no violation of the *Godfrey* principle in finding this particular aggravating circumstance. Nor is there any question that application of this aggravating factor was proper under the Alabama statute as construed by the Alabama courts.

. . . . .

. . . This new claim, challenging the validity of one of the aggravating circumstances found to exist in this case, is a question of law as to which no further hearing is required. For the reasons stated above, we conclude that the claim is without merit.

*Id.* 103 S.Ct. at 1738. While the procedural impact of that opinion might be subject to some question, given its emergency nature, this Court considers that opinion to be a decision on the merits foreclosing review in this Court. *C.f.* also *Barclay v. Florida,* ——— U.S. ———, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).

■ I. *Disproportionate Sentence.* Claim 9 (Para. 97–104) relates to the severity of petitioner's sentence with respect to the crime. This is not a challenge to any proportionality review aspect of the sentencing statute, *see generally, Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982), *cert. granted,* ——— U.S. ———, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983), but is instead a claim that petitioner's sentence of death was excessive in view of the fact that he was not the triggerman and, as petitioner now claims, he did not intend the death of Edward Nassar.

In *Enmund v. Florida,* ——— U.S. ———, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982); the United States Supreme Court held that it is unconstitutional to impose the death penalty where defendant "neither took life, attempted to take life nor intended to take life." In determining whether a defendant may constitutionally be sentenced to death, "the focus must be on *his* culpability, not on those who [killed the victim], for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence.' " *Id.,* ——— U.S. at ———, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152 (1982), (quoting *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct.

2954, 2965, 57 L.Ed.2d 973 (1978)) (emphasis in the original). Thus in determining whether to sentence a defendant to death, the focus is upon the defendant's intent, and more specifically, whether the defendant killed, attempted to kill, or had in some other fashion the constitutionally required intent to kill.

The Alabama Courts, both at the trial level and on appeal, have found that petitioner had the requisite intent to kill: petitioner was an accomplice to the intentional killing of Edward Nassar; he had previously agreed with Evans to kill anyone who attempted to go for a gun during one of those robberies; petitioner encouraged and supported the killing and was present with Evans' knowledge to render assistance should it have been necessary; petitioner would have killed Edward Nassar himself had Evans not been in his line of fire; and petitioner had the particularized intent to kill. (Findings of Fact 35–49). These Findings, which provide the basis for petitioner's death sentence, comport with the constitutionally required individualized inquiry into petitioner's intent as established in *Enmund, supra.*

Where such findings are fairly supported by the state court record, they are presumptively correct, and binding upon a federal habeas proceeding unless the petitioner can prove otherwise. 28 U.S.C. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Based upon this Court's review of the state court record and the testimony and evidence at the evidentiary hearing, this Court has found that "a trier of fact could conclude beyond a reasonable doubt that Defendant . . ." possessed the required intent to kill. *Stanley v. Zant,* 697 F.2d 955, 973 (11th Cir.1983). Accordingly, under 28 U.S.C. § 2254(d) and *Sumner, supra,* this Court is bound by the Alabama state court findings as to petitioner's intent, and concludes that petitioner's sentence of death was not disproportionate.

Petitioner did testify at his evidentiary hearing that he did not intend the death of Edward Nassar; however, that testimony was contradicted by a number of other wit-

nesses. Credibility is with the trier of fact, and in a habeas proceeding the district court is not required to accept self-serving testimony by the petitioner, even if it is uncontradicted; *e.g., Hawk v. Olsen,* 326 U.S. 271, 279, 66 S.Ct. 116, 120, 90 L.Ed. 61 (1945); *Burston v. Caldwell,* 506 F.2d 24, 26 (5th Cir.1975); *Tyler v. Beto,* 391 F.2d 993, 995 (5th Cir.1968); and a district court can, as here, certainly reject a habeas petitioner's testimony when it is contradicted by other witnesses or by state court record, *e.g., Burston v. Caldwell, supra; Dempsey v. Wainwright,* 471 F.2d 604, 607 (5th Cir. 1973); *Walker v. Beto,* 387 F.2d 626, 627 (5th Cir.1967). In resolving the discrepancy between the testimony of the petitioner and other witnesses at the hearing, this Court has for reasons articulated in this Court's Findings of Fact found independently of and in addition to findings made by the Alabama state courts that petitioner did indeed have the requisite intent to kill. Thus, based upon that finding of fact, this Court concludes, as a second and independent basis, that petitioner's sentence of death was not disproportionate and was therefore not unconstitutional.[20]

█ *J. Death by Electrocution and the Eighth Amendment.* Petitioner's Claim 10 (Para. 105–112) alleges that death by electrocution as administered in the State of Alabama is unconstitutional because it violates the Eighth Amendment's Cruel and Unusual Punishment Clause. That claim was dismissed on June 1, 1983 under Rule 41(b) of the Federal Rules of Civil Procedure following petitioner's presentation of evidence for reasons stated on the record.[21] A certified copy of a transcript of the decisional portion of the record is attached hereto as Appendix for the convenience of the parties and the appellate courts.

## IV. CONCLUSION

For the reasons stated in the above Findings of Fact and Conclusions of Law this Court will by separate document enter judgment against the petitioner, Wayne Eugene Ritter, denying all requested relief and dismissing the petition with prejudice. The Court will also dissolve the stay of execution entered on May 6, 1983.

## APPENDIX

JUDGE POINTER: In case 83–1080, Raines v. Smith, Et Al., I am at this time under Rule 41 going to dismiss this particular claim at the conclusion of the evidence presented by the petitioner.

I am going to at this time enter certain findings of fact and certain findings of law with respect to this claim.

As counsel are aware, of course there are 11 other grounds being asserted in support of the motion, but on this particular ground I find the evidence being presented to clearly indicate that the petitioners are due to lose on this particular issue. In this particular claim the petitioners assert that the infliction in the State of Alabama of electrocution as a means and method for execution constitutes a cruel and unusual punishment contrary to the Eighth Amendment.

Three separate types of claims or theories are presented. First it is claimed that at least in Alabama, given the nature of the equipment, the procedures used, that there is an unnecessary and wanton infliction of pain and suffering. Second it is claimed

---

**20.** The Court is aware of the statistics regarding the imposition of the death penalty on non-triggerman accomplices, see *Enmund v. Florida* and *Lockett v. Ohio,* supra, as well as decisions of Alabama courts in reducing death sentences imposed by juries on accomplices. It is clear such penalties are only infrequently imposed upon non-killers. This case, however, is an unusual one. The trial court judge, based upon the evidence, found that petitioner's conduct was only fortuitously distinguishable from that of his co-defendant, John Evans, who has been executed. As this Court noted in its Finding of Fact 49, petitioner was not so much a non-triggerman, but was rather an unneeded triggerman. Under these circumstances, petitioner's sentence of death, although statistically unusual, is not disproportionate.

**21.** The hearing on June 1, 1983 was a joint hearing with *Raines v. Smith,* et al., Case No. CV 83–P–1080–S, which is venued in the United States District Court for the Northern District of Alabama, the Hon. Sam C. Pointer, presiding. Judge Pointer announced the decision which was concurred in and adopted by this Court.

that the equipment and method involves an unreliable method of execution. Third it is asserted that it involves in its method and equipment a mutilation of the body which would be viewed as contrary and violative of the Eighth Amendment.

The facts however, as I view them, presented in this case are clear and without contradiction on certain points essentially.

First it is clear that properly done the use of the electric chair in Alabama and more particularly in the recent electrocution involved an instantaneous blocking of any sensory perceptions or instantaneously rendering the person unconscious so that he was unable to feel any pain even the immediate pain that presumably would be attendant to the electrocution of self. The evidence as I view it is uncontradicted that this so. It is not only that that is true if it is done correctly and properly but even in the situation of the most recent electrocution where there is a claim that there was some malfunction, the testimony still is that there was no sensation of pain felt by the person being executed.

This means, as I view it, that there is no wanton infliction of pain. Indeed, to the contrary. There is no indication of any pain whatsoever being suffered. There is testimony in this case that at some point based upon the fact that some of this equipment is old, that perhaps there are schematic diagrams that are missing, perhaps a lack of full understanding and comprehension as to the internal workings of the system and that this may fail at some point in the future in performing its assigned task of death. It was averred to in the testimony of the last witness which the witness agreed with that apparently some 154 times over a period of 50 years this chair, however, that is in question now, has been used apparently without any failure of its performing the function of execution. On the particular occasion, Mr. Evans' execution back in April of this year, the testimony reflects that there were three separate jolts of electricity or bursts of electricity, each approximately for 30 seconds in duration, that were involved in and about his execution. The total period of time involved was from the

start at 8:30 until the completion and certificate of death approximately 8:44, I believe it was, about 14 minutes.

The testimony is that Mr. Evans would not have felt anything from the second and third jolts and indeed felt nothing from the first, there having been an instantaneous rendering of him unconscious.

It is possible that this chair may not work in the future. That, however, does not render its use an unconstitutional punishment. Indeed, the Supreme Court in the case of Francis v. Resweber indicated in a case that even where an electrical malfunction occurred and a person had to be put back to the chair a second time at a later date, that that was not an unconstitutional punishment. The fact that this one may at some point fail materially falls within the doctrine of that case.

It should be noted that as the witness who was last on the stand testified giving some of the history of the electric chair, the Supreme Court and perhaps the same individual who was first electrocuted, Kemmler, in about 1890 ruled in the case of In Re Kemmler that that was not a cruel and unusual punishment and indeed was constitutional.

The only thing unusual really in this case that is being presented is the fact that there were three separate jolts of electricity or periods of current that after the first two there was an indication of a heartbeat, the first, after the first it was indicated that there was a steady and constant heartbeat. After the second jolt there was an indication of a weak, faint, but nevertheless steady heartbeat. However, again we go back to the point that there was no indication that there was any involved in this process and indeed the witness who testified testified that death would have been forthcoming, although on a longer period of time if the additional jolts had not been given.

There is one additional situation that is involved here and that is that the evidence reflects that the connectors in terms of the electrodes at the head and the leg were not sufficiently secure and close to the body so

as to prevent arcing and burning in the process and Mr. Evans' body did reflect, as witnesses have testified here, that there was that burning and arcing that occurred during this process, although he was not aware of it and would not have felt it which ended up or resulted in third and fourth degree burns to his head and to his one leg and ankle.

This appears that [1] to have been accidental and unplanned and no indication that this ever occurred at any prior time in the use of this chair. Here again, if one goes to the case of Francis v. Resweber, this would indicate that such an accidental malfunction does not render the type of electrocution as unconstitutional.

Secondly, assuming, although the law is not clear that there would be limits of mutilation of the body that might ultimately offend the Eighth Amendment, the degree of extent of the burns in this case does not in my judgment rise to the point of that kind of offensive mutilation of the body. At least in a situation where there is no indication of any perception of pain by the person and, here again, we come back that he would not have felt any of that.

The conclusion I reach is that under none of the theories presented when the Court looks at the evidence, can it be said that this use by the State of Alabama of this method of electrocution is unconstitutional in and about and relating to the manner or performance, the nature of the equipment and the like.

I do recognize that in the Raines case there are other attacks made in connection with the death penalty itself, but insofar as the selection or use of this electric chair, I am ruling in favor of the defendants and dismissing what I believe is Claim 5, I believe, in the Raines case.

And the clerk serving for clerk of both of the courts will make that notation and that will be the ruling of the Court in 83–1080.

JUDGE HAND: In 83–0457–H, Wayne Ritter, Petitioner v Fred Smith, Commissioner, Et Al., the Court will adopt the opinion expressed by Judge Pointer in the Raines case as being applicable in its totality to the situation as it fits in the Ritter case and will make a same and similar ruling on that issue as advanced by the petitioner.

We will recess this hearing until tomorrow morning when we will take up the balance of the issues raised in the Ritter case for which a hearing is scheduled.

JUDGE POINTER: And in the Raines case, as counsel are aware, I have set, subject to possible revision, June 27 for the hearing on the other issues in that case.

JUDGE HAND: 9:00 o'clock in the morning, gentlemen.

[Hearing concluded]